UNITED STATES, Appellee,

v.

Specialist Juan F. DIAZ, Jr., United States Army, Appellant.

ARMY 9900768.

U.S. Army Court of Criminal Appeals.

29 March 2002.

For Appellant: Joseph W. Kastl (argued); Major Jonathan F. Potter, JA (on brief); Major Steven P. Haight, JA; Captain Terri J. Erisman, JA.

For Appellee: Major Paul T. Cygnarowicz, JA (argued); Colonel Steven T. Salata, JA; Lieutenant Colonel Denise R. Lind, JA; Lieutenant Colonel Paul H. Turney, JA (on brief).

Before MERCK, Senior Judge, CURRIE, and JOHNSON, Appellate Military Judges.

## OPINION OF THE COURT AND ACTION ON PETITION FOR NEW TRIAL

CURRIE, Judge:

A general court-martial composed of officers convicted appellant, contrary to his pleas, of unpremeditated murder and assault upon a child under sixteen years of age, in violation of Articles 118 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 928 [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a dishonorable discharge, life imprisonment, forfeiture of all pay and allowances, and reduction to the grade of Private E1. This case is before the court for review under Article 66, UCMJ, 10 U.S.C. § 866.

The victims were appellant's infant daughters. He now asserts, inter alia, that the military judge erred by denying his motion for a mistrial and that the evidence is legally and factually insufficient to support the findings. He also has petitioned this court for a new trial based on newly discovered evidence. We hold that appellant is entitled to no relief. We also hold that the staff judge advocate's (SJA) addendum to his post-trial review is deficient, but that appellant was not prejudiced.

### FACTS

On 25 November 1992, Nicole was born to appellant and his wife, Shelly.

On 23 January 1993, Shelly brought Nicole to Reynolds Army Community Hospital, Fort Sill, Oklahoma, with second-degree burns to the entire left side of her face. That evening, Nicole was flown to Children's Hospital

in Oklahoma City for treatment. Appellant made conflicting statements about how Nicole suffered these burns. He first said Nicole expressed no discomfort when he held her face close to the steam of a vaporizer for five to ten seconds to clear her of a cold's congestion. He later claimed hot water splashed on her face when the vaporizer fell.

While treating Nicole, doctors at Children's Hospital noted other injuries, including bruises to her face and chest and healing posterior rib fractures seven to fourteen days old. Authorities suspected abuse and placed Nicole in foster care. There she thrived. She was returned to her parents' custody on 5 November 1993.

In November 1993, Shelly and Nicole visited Shelly's family in Hawaii for several weeks. In December 1993, appellant, Shelly, and Nicole visited appellant's family in Texas for one to two weeks.

In the early morning of 11 February 1994, appellant and Shelly brought Nicole to Reynolds Army Community Hospital. She arrived lifeless. Attempts to revive her were futile.

Appellant was alone with Nicole before her death. Appellant said, in a statement he made about twelve hours after Nicole's death, that as his wife slept, he removed Nicole from her crib because she was coughing. He gave her some Dimetapp cough medicine, and laid her on his lap as he watched television. After sitting with Nicole for about fifteen minutes, he picked her up to put her back in her crib. At that time, he noticed Nicole was limp and not breathing. Appellant claimed that Nicole did not indicate any distress before she died. Appellant unsuccessfully tried to resuscitate her. He then went to the bedroom and woke up Shelly. After Shelly telephoned a neighbor for advice, she and appellant drove Nicole to Reynolds Army Community Hospital, a short distance from their apartment.

A state medical examiner, Dr. Balding, performed an autopsy on Nicole. He concluded:

There is no anatomic or toxicologic cause of death in this case. Because of this, the age of the child, and past history of possible abusive injuries (rib fractures, contusions, and a burn to the face) the cause of death is listed as unknown.... It is felt that the past history of unexplained or inadequately explained injuries in this child is a significant condition.

He also found "no evidence of intracranial hemorrhage or infection" and that the brain was "normally formed and show[ed] no evidence of injury or disease." The autopsy report listed Nicole's cause of death as "unknown" and the manner of death as "undetermined."

In September 1994, appellant was transferred to Hawaii pursuant to military orders.

On 5 January 1995, appellant's daughter, Jasmine, was born.

On 30 July 1995, appellant burned Jasmine's inner left thigh with the tip of a heated cigarette lighter. Appellant claimed that he accidentally dropped the lighter on Jasmine after trying to ignite a caterpillar that had crawled into her crib.

In October 1995, at the request of Hawaiian Child Protective Services (CPH), Captain (Dr.) Tremaine, a board-certified pediatrician, evaluated Jasmine's injuries to determine if they were the result of accidental or non-accidental trauma. Doctor Tremaine determined that each of the three burns were "classic branding injur[ies]," and were not incurred accidentally. Child Protective Services removed Jasmine from her parents' custody.

By July 1996, Jasmine was returned home, but on several conditions, including that appellant move out of the family home and not visit with Jasmine present. He and Shelly entered into a "service plan" with CPH that required, inter alia, that appellant "realize the severity of Jasmine's injury and assume responsibility and apologize for Jasmine's injury."

In July 1997, appellant was transferred to Fort Drum, New York. Shelly remained in Hawaii to retain custody of Jasmine.

In November and December 1997, appellant sought counseling, as required by CPH in order to be reunited with Shelly and Jasmine. Appellant met with Ms. Reagan Am-

lin, a Fort Drum social worker, on four occasions. Appellant initially made conflicting statements regarding Jasmine's injury, but at the end of the second session admitted he had intentionally burned her. He also made incriminating remarks regarding Nicole's death.

## I. MOTION FOR A MISTRIAL

### A. Background

At trial, the government's strategy was to establish a pattern of abuse by appellant against his infant daughters, that Nicole did not die of natural causes, and that murder was the only logical explanation for Nicole's death. It presented the testimony of several expert witnesses to this effect, as well as incriminating statements appellant made to Ms. Amlin.

Ms. Amlin testified that she suspected appellant had abused Jasmine because of the incredible version of that event he first gave her and CPH's requirement that he seek counseling. After appellant confessed to intentionally injuring Jasmine, and because she was aware of Nicole's death and evidence that appellant had abused her, Ms. Amlin "started to look for a pattern." At the third session, she again asked how Jasmine was injured. Ms. Amlin testified that appellant had told her:

Mrs. Diaz was sleeping, it was late at night, he'd taken Jasmine from the crib. He said he was on the sofa watching television. He said he laid her down, heated the lighter up, got it hot and placed it on her thigh. When I asked him why he did that, he said "I wanted to see what she would do."

They then discussed Nicole. First, she asked appellant about the burns to Nicole's face. Ms. Amlin testified appellant said:

[A]gain, Mrs. Diaz was asleep, it was late at night. Nicole had a cold, and he removed the child from the crib and placed her face over a steamer. He indicated that he was holding the child over the steamer with her face getting the steam. He indicated that he was doing that to help her breathe.

Ms. Amlin asked appellant to explain Nicole's burns:

I said, "Did you not see that the child was in distress? Steam is very hot. If she was burning, did the child not struggle or cry out or try to move away from the source of the heat?" He indicated that she made no movement at all, and he didn't realize he was burning the child, and the child didn't give any indication that it was being hurt.

Ms. Amlin then asked about Nicole's death. Ms. Amlin testified that appellant told her:

[T]he night Nicole died, again, Mrs. Diaz was sleeping. He'd taken Nicole from the crib, was sitting on the sofa in the living room and again, watching TV. He indicated to me that when he was ready to go to bed, he took the child to put her back in the crib, and it was at that time that he discovered that the child had died.

Unconvinced that Nicole died of natural causes, at the fourth session Ms. Amlin told appellant she believed he had killed Nicole. Appellant told her he did not want to go to jail. Ms. Amlin testified that she "confronted him again and said, 'I'm very convinced that you killed Nicole.' He paused, and at one point, he said, 'You don't know the half of it.'"

The day after Ms. Amlin testified, the trial defense counsel and military judge discussed her testimony:

DC: I'm talking about Ms. Amlin, who has testified to her opinion that this was a homicide—

MJ: No, she did not. I'm going to give a limiting instruction this morning. She testified that when she talked to your client in therapy, she confronted him with her thoughts and her suspicions.

DC: I believe she also—there's another part of her testimony that she stated, "I was convinced that he killed his daughter."

MJ: I'm going to give a limiting instruction to the effect of whatever extent the jury might come to that conclusion by her testimony. That expression—I remember one. It might've happened more than that. It concerned me last night when I thought about it, because I think the jury

could be misled into believing that her feeling was that he did it. That expression was used in the course of her therapy to talk to your client. That wasn't her standing up here saying "I know he did it." I'll give a limiting instruction. I just wanted to clarify what you were talking about.

After the military judge and counsel discussed several other matters, the members returned to the courtroom. The military judge then gave them this instruction:

Members of the court, yesterday afternoon you heard the testimony of Ms. Reagan Amlin. She testified about her four sessions with Specialist Diaz. She testified that during one or more of the sessions, she told Specialist Diaz that she either didn't believe him, or she confronted him with her thoughts that a crime was committed. You members, as the voice of the community, have to decide the issues in this case based upon the evidence that's presented to you in court. Nobody can tell you what happened. That's your job and there are no shortcuts. There is no witness that can tell you that a crime occurred; that's your job to determine that issue.

So to the extent that you believe that Ms. Amlin testified or implied that she believed that Specialist Diaz committed a crime, committed a murder, committed an intentional burn, you may not consider that as evidence that a crime occurred, because that's your job. She used that technique during her therapy to talk with the client. Do you understand what I'm telling you here? You've got to make the decisions in this case, and there's nobody that can shortcut your job, although I'm sure that would make it easier for you.

Doctor Stuemky, a pediatrician and an expert in child abuse, testified next for the government. Doctor Stuemky had examined Nicole after she had been burned in January 1993, and noticed the bruises on Nicole's face and her broken posterior ribs. In his expert opinion, "[c]hildren do not bruise easier than adults; it takes the same amount of force to cause a bruise in an infant as it does to cause a bruise in an adult." He also testified that an infant's bones "are very pliable. They bend easier than they break. Rib fractures are of special significance in infants and small children, because they're considered— we use the term 'pathenemonic,' meaning the only cause of rib fractures in infants and small children, particularly posterior rib fractures, is child abuse."

His next contact with Nicole occurred about two years later as a member of Oklahoma's Child Death Review Board. The board reviews the deaths of all children under the age of eighteen that occur in Oklahoma, and determines whether a child's death is the result of abuse. After describing the board's methodology, Dr. Stuemky discussed Sudden Infant Death Syndrome (SIDS). He said the National Institutes of Health have defined SIDS as "a sudden, unexplained death in an infant under 12 months of age in whom an autopsy has in fact been performed, and no other causes or abnormalities are noted, and in whom an adequate death scene investigation has been performed." He stated SIDS is "primarily an event that occurs in infants under 6 months of age. Ninety percent of SIDS deaths are under 6 months of age, with the peak time of SIDS deaths between 2–4 months of age."

At this point, during a break in Dr. Stuemky's testimony, the military judge, clarifying an earlier ruling, cautioned the trial counsel that the witness could not say, "Specialist Diaz murdered his daughter."

My ruling does allow you to ask whether the injuries are consistent with a child abuse death; whether he has an opinion as to whether the injuries were caused by child abuse; whether he has an opinion as to whether this was a SIDS death, or inconsistent with a SIDS death. I'll let him do that. I want to make sure you understand that my ruling did not say that he could stand up there and point a finger at Specialist Diaz and say, "He killed his daughter." Do you understand my prior ruling?

ATC: Yes, Your Honor.

After the break, Doctor Stuemky discussed the factors other than age that the Board considers when evaluating a possible SIDS

death, including whether the child was sleeping at the time of death, autopsy results, and a family social history to determine whether there was prior child welfare involvement.

Turning to Nicole's death, Dr. Stuemky said he considered Dr. Balding's conclusions that there was no biological, anatomical, or toxicological cause of death as "very significant, because it means at 14 months of age, in the absence of those findings, we would not consider this a natural cause of death. Our concern is that something had to have caused this death. And our concern is that it's most likely consistent with suffocation." Doctor Stuemky said Nicole had "been in good health prior to this event, and then the child suddenly dying laying on the dad's lap. This is not a—this is very worrisome. Children just don't die suddenly [lying] on a parent's lap."

When trial counsel then asked Dr. Stuemky for his conclusions, he replied, "My conclusions were that this was a homicide death—that this was a physical abuse death. And furthermore, I felt that the perpetrator was the father." The military judge excused the members, and defense counsel immediately moved for a mistrial, implying that the motion was based, in part, on the cumulative effect of Ms. Amlin's and Dr. Stuemky's testimony. She stated, "[T]his is particularly disturbing because you specifically told [trial counsel] that that witness could not say that." The trial counsel responded that Dr. Stuemky's testimony "was totally unexpected," and that

I did, during the last recess, talk with Dr. Stuemky and gave clear instructions on what he could and could not say, and that was one of the matters that we spoke of. He could talk about exactly as you had instructed—prior to the last break, I went out and I reiterated everything. I stated that he could say it was consistent with child abuse. Again, Your Honor, I did not expect that. I did instruct the witness that he could not go there.

The military judge immediately gave a curative instruction to the members:

MJ: Members of the court, early on in this trial and during the case on several occasions, I've told you that you have to decide the facts in this case, and you have to make a determination as to whether a crime occurred. You have to make a determination as to the believability or credibility of witnesses. And you have to follow my instructions. Earlier on when we did the voir dire portion of the trial, I told you in my preliminary instructions—I told you that you were required to follow the instructions that I gave you, and you all assured me that you could do that.

I'm going to give you some instructions concerning expert testimony. An expert—a person is allowed to testify as an expert because his testimony may be helpful to you in coming to conclusions about issues. The witness you've been hearing has been qualified as an expert in a specific discipline because his knowledge, skill, experience, training or education may assist you in understanding the evidence, or in determining a fact in issue. But [t]he point is that you have to determine the fact in issue. Do you understand that?

MEMBERS: [Affirmative responses.]

MJ: You are not required to accept the testimony of an expert witness or give it any more or less weight than that of an ordinary witness. But you should consider the expert's experience and qualifications in the specific area.

Expert witnesses are allowed to render opinions, and those opinions are only allowed if they're helpful to you, the fact finder. But again, bear in mind that you have the ultimate determination as to a conclusion about the issues in the case.

An expert witness cannot tell you that he thinks a crime occurred, because that's not helpful to you, because you have to decide that. An expert witness cannot tell you that a witness is lying or truthful, or he cannot even tell you that a crime occurred. Because you have to decide that based on all the evidence, and only the evidence, that's been presented to you in the courtroom. Do you understand that?

MEMBERS: [Affirmative responses.]

MJ: To the extent that Dr. Stuemky opined that he thought a crime occurred, and that a particular person committed

that crime, you *cannot* consider that, because that's not helpful to you. You have to make that decision.. Do you understand that?

MEMBERS: [Affirmative responses.]

MJ: As I told you earlier this morning, there's nobody that can help you in that regard, because you have to make your decision based on the evidence that's presented to you here in court. Nobody else has the unique situation of being present to hear all the evidence in court. Do you understand what I'm telling you?

MEMBERS: [Affirmative responses.]

MJ: I'm telling you that you must disregard any testimony about whether a crime occurred, or whether this soldier committed a crime. Do you understand that?

MEMBERS: [Affirmative responses.]

MJ: And you can't consider that for any reason during your deliberations. Do you understand that?

MEMBERS: [Affirmative responses.]

MJ: I've gotten affirmative responses by every member to this point.

You can consider evidence that certain—as to an opinion about whether injuries were consistent with SIDS or not consistent with SIDS, or whether the injuries were consistent with a child abuse-type death. But you cannot consider any testimony as to what this witness thought as to who did it. Do you understand that?

MEMBERS: [Affirmative responses.]

MJ: It's important that if you cannot follow that instruction that you tell me. I'm going to ask each of you.

Each member individually told the military judge that he or she understood and would follow his instructions. The military judge then denied the motion. Appellant now asserts the military judge abused his discretion by denying the motion. We disagree.

### B. Standard of Review

■ "Declaration of a mistrial is a drastic remedy, and such relief will be granted only to prevent a manifest injustice against the accused. The decision to grant a mistrial rests within the military judge's discretion, and we will not reverse his determination absent clear evidence of abuse of discretion." *United States v. Rushatz,* 31 M.J. 450, 456 (C.M.A.1990) (citations omitted); *see also* Rule for Courts–Martial [hereinafter R.C.M.] 915(a) discussion ("The power to grant a mistrial should be used with great caution, under urgent circumstances, and for plain and obvious reasons.").

■ Whether the military judge abused his discretion depends on the "circumstances arising during the proceedings" and whether those circumstances "cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a); *see also United States v. Taylor,* 53 M.J. 195, 198 (2000). Doctor Stuemky's improper statement was the equivalent of a nonconstitutional evidentiary error. *Cf. United States v. Armstrong,* 53 M.J. 76, 81 (2000) (improper testimony by a government psychologist that victim had been "sexually abused by her father[,]" the accused, was a nonconstitutional evidentiary error). Therefore, to determine prejudice, the question is whether the error was harmless, i.e., did the error substantially influence the findings. *United States v. Pollard,* 38 M.J. 41, 52 (C.M.A.1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also* UCMJ art. 59(a), 10 U.S.C. § 859(a). In other words, we must weigh "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Kerr,* 51 M.J. 401, 405 (1999) (citing *United States v. Weeks,* 20 M.J. 22, 25 (C.M.A.1985)). In that regard, a military judge's curative instructions may render an evidentiary error harmless. *United States v. Harris,* 51 M.J. 191, 196–97 (1999); *United States v. Skerrett,* 40 M.J. 331, 333 (C.M.A.1994). Moreover, "[g]iving a curative instruction, rather than declaring a mistrial, is the preferred remedy for curing error when court members have heard inadmissible evidence." *Rushatz,* 31 M.J. at 456 (citing *United States v. Evans,* 27 M.J. 34, 39 (C.M.A.1988)); *see generally United States v. Barron,* 52 M.J. 1, 4 (1999).

### C. Holding

■ We hold that the military judge did not abuse his discretion. First, the members

802

individually assured the military judge that they would follow his instructions to ignore Dr. Stuemky's improper statement, and we presume they did so. *United States v. Loving,* 41 M.J. 213, 235 (1994); *Rushatz,* 31 M.J. at 456 (citing *Lakeside v. Oregon,* 435 U.S. 333, 340, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978)). Second, there is less to Dr. Stuemky's statement than might appear at first blush. By virtue of appellant's own pretrial admissions, identity was not an issue in this case. Doctor Stuemky's statement that appellant was "the perpetrator" was based on the fact that appellant admitted he was alone with Nicole when she died and his conclusion that Nicole did not die a natural death, i.e., that her death was consistent with child abuse and not consistent with SIDS, and that the autopsy report was consistent with the conclusion that she had been suffocated. Third, Dr. Stuemky's statement was not made in a vacuum. The government's case was strong. Apart from the evidence noted above, the record clearly established a pattern of behavior by appellant of intentionally inflicting serious injuries on his infant daughters during the short periods of time they were in his custody. *Cf. United States v. Tyndale,* 56 M.J. 209, 213 (2001) (our superior court has accepted the "doctrine of chances as a viable theory of logical relevance[,]" i.e., that it "is unlikely a defendant would be repeatedly, innocently involved in similar, suspicious circumstances"). We are convinced that Dr. Steumky's improper statement did not influence the members' findings.

## II. SUFFICIENCY OF THE EVIDENCE

The test for legal sufficiency of the evidence is whether, considering the evidence in the light most favorable to the government, a court could rationally find the existence of every element beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Blocker,* 32 M.J. 281, 284 (C.M.A. 1991). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this court is convinced of appellant's guilt beyond a reasonable doubt. UCMJ art.

66(c); *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987). We find that the approved findings are legally and factually sufficient.

## III. PETITION FOR A NEW TRIAL

Regarding Nicole's death, appellant has petitioned us for a new trial based on newly discovered evidence. He claims the material he has provided us establishes that Nicole "most likely" died as a result of a dose of an over-the-counter cold medication, Dimetapp, which her parents gave her shortly before her death. We disagree.

Article 73, UCMJ, 10 U.S.C. § 873, provides that appellant can petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." When the petition is filed while the case is pending before this court, it is appropriate for us to take action. UCMJ art. 73; R.C.M. 1210(e). Where a new trial is requested on the basis of newly discovered evidence, R.C.M. 1210(f)(2) provides that a new trial shall not be granted unless the petition for new trial shows that:

(A) The evidence was discovered after the trial;

(B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

(C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

*See also United States v. Bacon,* 12 M.J. 489 (C.M.A.1982). The petitioner bears the burden of showing that a new trial would probably produce a substantially more favorable result. *United States v. Giambra,* 38 M.J. 240 (C.M.A.1993); *United States v. Parker,* 36 M.J. 269 (C.M.A.1993). Petitions for a new trial generally are disfavored and should be granted only when the refusal to grant a new trial would result in a "manifest injustice." *United States v. Brooks,* 49 M.J. 64, 68 (1998) (quoting *United States v. Williams,* 37 M.J. 352, 356 (C.M.A.1993)).

■ The gist of appellant's argument is that the Dimetapp given to Nicole contained phenylpropanolamine (PPA), which increases the risk of stroke, sometimes after just one dose, and that this evidence "could not have been discovered" before his trial. Given that the autopsy did not fix the cause of Nicole's death, appellant states this new evidence "affords him a potent and viable defense." In support of his petition, appellant has provided, inter alia, the affidavit of a registered nurse (appellant's aunt) with thirty years experience that, in her opinion, Nicole "could very likely have died from an undetectable non-bleeding stroke in the brain as a result of taking a normal therapeutic dose of Dimetapp"; the affidavit of a physician who treated a seven-week-old infant who he believes suffered an intracranial hemorrhage (ICH) caused by the PPA in a therapeutic dose of Dimetapp; a Yale University study, dated 10 May 2000, that indicates PPA increases the risk for hemorrhagic stroke in men and women 18–49 years old; and several articles from scientific and medical journals dated 1984 to 1987 discussing the possible link between PPA and ICH. On 6 November 2000, the Food and Drug Administration announced a ban on the sale of over-the-counter products containing PPA.

We find that Nicole received a therapeutic dose of Dimetapp the night she died. Nicole's autopsy report showed her blood contained a small amount of brompheniramine, an ingredient in Dimetapp. Her blood apparently was not tested for PPA, but we assume the Dimetapp she took contained it.

At trial, defense counsel questioned Dr. Stuemky whether Dimetapp could have played a role in Nicole's death as a respiratory depressant. Doctor Stuemky rejected this theory as Dimetapp would only have this effect if administered at inappropriately high levels. Trial defense counsel did not explore the possible link between PPA and her death.

We first find that appellant has failed to establish that evidence about the link between even sporadic or isolated doses of PPA and ICH was not discoverable at the time of trial in the exercise of due diligence. R.C.M. 1210(f)(2)(B). As the articles appellant provided us show, the connection between the two was suspected at least fifteen years before his trial.

Regardless, we find that this "new" evidence, when considered in the light of all other pertinent evidence, would not probably produce a substantially more favorable result for appellant. R.C.M. 1210(f)(2)(C). During Nicole's autopsy, Dr. Balding examined her central nervous system, including the brain. He found "no evidence of intracranial hemorrhage or infection." The brain was "normally formed and show[ed] no evidence of injury or disease." A subsequent neuropathological report found no evidence of injury or natural disease. Appellant has provided us evidence which links PPA and ICH. As it is clear that Nicole did not succumb to an ICH, we are convinced, in light of all the evidence properly before the court, that the members would not change their findings if they also considered the "new" evidence. *See Brooks*, 49 M.J. at 69 ("The reviewing court does not determine whether the proffered evidence is true; nor does it determine the historical facts. It merely decides if the evidence is sufficiently believable to make a more favorable result probable.").

We hold that appellant has not met his burden of production required by Article 73, UCMJ, and R.C.M. 1210(f), and deny his petition.

## IV. THE SJA'S ADDENDUM TO HIS POST–TRIAL RECOMMENDATION

Although not raised by appellant, we also note that the SJA's addendum to his post-trial recommendation (PTR) is deficient. In his R.C.M. 1105 matters, appellant alleges four legal errors: that the military judge erred to his substantial prejudice by denying trial defense counsel's motions (1) for a mistrial after Dr. Stuemky's improper statement; (2) to suppress statements appellant made to Ms. Amlin, in violation of the psychotherapist-patient privilege and Article 31(b), UCMJ, 10 U.S.C. § 831(b); (3) to suppress statements made to Dr. Tremaine, in violation of Article 31(b), UCMJ; and (4) to exclude evidence of appellant's alleged prior abuse of Nicole. The SJA ignored the alle-

gations of legal error in his addendum to his PTR.

Rule for Courts–Martial 1106(d)(4) provides that when an allegation of legal error is raised in the R.C.M. 1105 matters, the SJA shall state an opinion as to whether corrective action should be taken. While an analysis of the SJA's rationale is not required, some sort of minimal response stating agreement or disagreement is required. *United States v. Catrett,* 55 M.J. 400, 407–08 (2001). In this case, the SJA did not comply with this minimal requirement.

In *United States v. Hill,* 27 M.J. 293, 296 (C.M.A.1988), our superior court held that, in most instances, the failure of the SJA to respond to a defense allegation of legal error "will be prejudicial and will require remand of the record to the convening authority for preparation of a suitable recommendation." In *United States v. Welker,* 44 M.J. 85, 88 (1996), however, the court indicated that, on appeal, it may examine the underlying allegations of error to determine whether the SJA's failure to comment on them resulted in a violation of appellant's substantial rights. If the appellate court finds that "there is no error in the first instance at trial, we will not find prejudicial error in the failure of the SJA to respond." *Id.* at 89; *see also United States v. Hamilton,* 47 M.J. 32 (1997).

We held *supra* that the military judge properly denied appellant's motion for a mistrial. We also have carefully reviewed appellant's remaining allegations of legal error and hold they are without merit. First, at the time of appellant's trial, the psychotherapist-patient privilege was not applicable to courts-martial. *United States v. Rodriguez,* 54 M.J. 156 (2000). Regardless, communications of child abuse are not protected by the privilege. Military Rule of Evidence 513(d)(2) [hereinafter Mil. R. Evid.]. Second, Ms. Amlin and Dr. Tremaine were not required to provide appellant an Article 31(b), UCMJ, rights warning. Ms. Amlin was not a person subject to the UCMJ, thus Article 31(b) was not applicable to her. Also, neither she nor Dr. Tremaine talked to appellant for a law enforcement or disciplinary purpose. Ms. Amlin questioned appellant as a social work therapist. Doctor Tremaine questioned appellant as a medical doctor treating Jasmine. *See United States v. Bowerman,* 39 M.J. 219 (C.M.A.1994). Third, the military judge properly applied the three-pronged test for admissibility of evidence of uncharged misconduct under Mil. R. Evid. 404(b) as explained in *United States v. Reynolds,* 29 M.J. 105, 109 (C.M.A.1989). *See also* Mil. R. Evid. 401 and 403; *United States v. Young,* 55 M.J. 193, 196 (2001).

Therefore, we find that the SJA's error did not prejudice appellant. *Hill,* 27 M.J. at 297 (no prejudice if the alleged legal errors "lacked merit and would not have resulted in either a comment by the [SJA] favorable to [appellant] or [in] any 'corrective action' by the convening authority"); *see also United States v. Wheelus,* 49 M.J. 283, 289 (1998).

We have considered the remaining assignments of error and those matters personally raised by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982), and hold they are without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge MERCK and Judge JOHNSON concur.