Judge GIERKE
delivered the opinion of the Court.
A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of unpremeditated murder and assault upon a child under 16 years of age, in violation of Articles 118 and 128, Uniform Code of Military Justice [hereinafter UCMJ] 10 U.S.C. §§ 918, 928 (2000), respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. United States v. Diaz, 56 M.J. 795 (A.Ct.Crim.App. 2002).
This Court granted review of the following issues:[1]
I.
WHETHER THE MILITARY JUDGE ERRED IN ALLOWING GOVERNMENT EXPERTS TO TESTIFY REGARDING PRIOR INSTANCES OF ALLEGED MISCONDUCT.
II.
WHETHER THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION FOR A MISTRIAL FOLLOWING THE IMPROPER TESTIMONY OF TWO GOVERNMENT WITNESSES.
III.
WHETHER THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS APPELLANT’S STATEMENTS, OBTAINED BY CPT TREMAINE IN VIOLATION OF APPELLANT’S RIGHT UNDER ARTICLE 31, UCMJ, SOLELY BECAUSE OF CPT TREMAINE’S STATUS AS A MEDICAL DOCTOR.
*81 rv.
WHETHER APPELLANT’S RIGHT TO DUE PROCESS WAS VIOLATED WHEN THE MILITARY JUDGE ERRONEOUSLY FAILED TO SUPPRESS APPELLANT’S STATEMENTS TO MS. AMLIN WHERE (1) SUCH STATEMENTS WERE NOT PRECEDED BY ARTICLE 31 WARNINGS WHICH WERE REQUIRED TO BE GIVEN SINCE MS. AMLIN WAS ACTING AS AN INSTRUMENTALITY OF THE MILITARY; (2) ARMY REGULATION 608-18 REQUIRES THAT SOCIAL WORKERS PROVIDE ARTICLE 31 WARNINGS PRIOR TO QUESTIONING A SOLDIER ABOUT DOMESTIC ABUSE AND SUCH REGULATION WAS INTENDED TO CONFER A SUBSTANTIAL RIGHT ON THE ACCUSED; AND (3) WHERE SUCH STATEMENTS WERE UNLAWFULLY INDUCED IN VIOLATION OF ARTICLE 31(d) AND THE FIFTH AMENDMENT PROHIBITION AGAINST COMPULSORY SELF-INCRIMINATION THROUGH THE REMOVAL OF APPELLANT’S DAUGHTER FROM HIS CUSTODY BY CHILD PROTECTIVE SERVICES TWO YEARS BEFORE AND BY THE THREAT THAT IF HE DID NOT CONFESS TO INTENTIONALLY HARMING HIS DAUGHTER HIS PARENTAL RIGHTS WOULD BE PERMANENTLY TERMINATED.
For the reasons set out below, we reverse the decision of the Court of Criminal Appeals. Because we address Issues I and II and hold for Appellant, we do not reach Issues III and IV.

I. BACKGROUND AND OVERVIEW

The charges against Appellant arose from a series of severe injuries to Appellant’s two infant daughters, Nicole and Jasmine, and the death of Nicole, all occurring between January 1993 and July 1995. Each injury and Nicole’s death occurred while Appellant was alone with the children. Appellant’s pretrial statements provided his only explanation of the circumstances of the injuries and the death.
The prosecution attempted to prove its case by establishing a “pattern of abuse by [Ajppellant against his infant daughters” in both uncharged misconduct and the charged offenses. Diaz, 56 M.J. at 798. Appendix A to this opinion is the prosecution’s “Chronology” used by the trial counsel in the opening statement to demonstrate this alleged pattern of abuse. The prosecution’s case was built on expert medical testimony, Appellant’s admissions, and circumstantial evidence.
The defense objected to the admissibility of the uncharged misconduct and Appellant’s admissions. The defense also filed repeated motions in limine to limit the scope of expert medical testimony thereby laying the foundation for each of the granted issues.
While each of these issues invites scrutiny, we need not address all of them. A critical error at trial was the testimony of a key prosecution medical expert who, contrary to the explicit ruling of the military judge and the apparent direction of the trial counsel, testified that Appellant killed his infant daughter. This error was compounded by similar testimony by a social worker. The judge denied a defense motion for a mistrial and attempted to cure the error by giving a curative instruction to the members. It is the impact of this error on the entire proceeding that is the focus of our decision. See 59 M.J. at 80 (Granted Issues I and II).

II. FACTS

A Bums and, other physical injuries to Nicole Diaz

On November 25, 1992, Nicole was born to Appellant and his wife. On January 23,1993, Nicole was sick with a cold — runny nose and coughing. Following the direction of a nurse at the Fort Sill, Oklahoma, clinic, Mrs. Diaz purchased a vaporizer. Mrs. Diaz read the directions and set it up in the bedroom she and Appellant shared with the baby.
While Mrs. Diaz was in the shower, Appellant placed Nicole over the vaporizer, which resulted in her being seriously burned. The *82 burn extended from her upper lip to her hairline on the entire left side of her face. When Mrs. Diaz returned to the bedroom, Appellant told her that he heard Nicole’s congestion and “that he’d put her over the vaporizer to help her breathe, because it would help her breathe better.”
Immediately, they took Nicole to Reynolds Army Community Hospital in Fort Sill. Nicole was flown to Children’s Hospital in Oklahoma City for treatment because she had second degree burns. While treating Nicole, doctors at Children’s Hospital noted other injuries, including bruises to her face and chest. X-rays revealed leg fractures and healing posterior rib fractures, which appeared to be seven to fourteen days old.
Dr. Oscar Falcon was interning at Children’s Hospital on the night Nicole was admitted for her burn. Dr. Falcon was working in the plastic surgery department and examined Nicole. He saw the burns on her face and bruises to her face and chest.
Dr. Falcon interviewed both Appellant and Mrs. Diaz as part of the treatment. Appellant told Dr. Falcon that Nicole was burned when “the steamer had fallen and hot water had splashed over [Nicole’s] face.” This was different from what Appellant previously told his wife. At trial, Dr. Falcon testified that he was “99 percent sure” that Appellant informed him of how Nicole was burned, as opposed to Mrs. Diaz, but conceded that he was not “100 percent sure” because six years had elapsed between his treatment of Nicole and his trial testimony.
These events triggered a report of suspicion of abuse and neglect to Oklahoma social services department. The source of the report is unclear from the record. Following up on this report, Dr. John H. Stuemky, another doctor, examined Nicole. Dr. Stuemky was a pediatrician with over thirty years of experience and wearing “many hats.” He was an associate professor of pediatrics at the University of Oklahoma College of Medicine. He also served as Chief of the Pediatric Service, Medical Director of the Emergency Department, and Chairman of the Child Protection Committee for Children’s Hospital.
The Child Protection Committee is charged with reviewing cases of suspected child abuse and neglect. This committee ensures that appropriate information is collected in the hospital (the medical findings, medical evaluations, social service reports) and is shared with the appropriate investigatory agencies to evaluate suspicions of abuse and neglect. As chairman of the committee, Dr. Stuemky evaluated Nicole.
Dr. Stuemky examined Nicole’s burns and reviewed the medical records and X-rays. The X-rays showed three posterior rib fractures. He made sure this information was passed on to Child Welfare and other appropriate agencies.
Also at Children’s Hospital, Ms. Jo Ellen Copeland, a social worker, questioned Appellant about possible abuse of Nicole. Appellant admitted bruising Nicole and made conflicting statements about how she suffered the burns. Appellant first told her that he held Nicole over the vaporizer for three to four seconds, then changed it to between eight and ten seconds. In this and two later interviews, Appellant provided three different descriptions of how he held Nicole when she was burned.
Ms. Copeland asked that the police be contacted and that Nicole be placed in protective custody. Nicole was placed in foster care, where she remained in excellent health and thrived. On November 5, 1993, when Nicole was approximately one year old, she was returned to the care and custody of her parents.

B. The death of Nicole Diaz

On February 11, 1994, Nicole died while she was alone with Appellant. Nearly twelve hours after Nicole’s death, in a videotaped interview with Lawton Oklahoma Police, Appellant said that he and his wife again were in the bedroom of their apartment with Nicole sleeping in her crib. Appellant removed Nicole from her crib because she was coughing. He gave her some Dimetapp cough medicine and laid her on his lap as he watched television in the living room.
After sitting with Nicole for about fifteen minutes, he picked her up to put her back in *83 her crib. At that time, he noticed Nicole was limp and not breathing. Appellant claimed that Nicole did not indicate any distress before she died. Appellant unsuccessfully tried to resuscitate her. He then went to the bedroom and woke Mrs. Diaz. After Mrs. Diaz telephoned a neighbor for advice, she and Appellant drove Nicole to Reynolds Army Community Hospital, a short distance from their apartment.
Mary Hyde, a registered nurse, was working at Reynolds Army Hospital. At the reception desk, she observed Nicole, who was “obviously unresponsive,” lying limp across Mrs. Diaz’s arms. Mrs. Diaz told Ms. Hyde that Nicole had been unresponsive for “[a] while.” Nicole was not breathing and she did not have a pulse. Her eyes were fixed and dilated. There were no obstructions to her breathing. Ms. Hyde brought Nicole to the trauma room, where she and a doctor unsuccessfully attempted to resuscitate her.
Dr. Larry Balding, a Deputy Medical Examiner in the Office of the Chief Medical Examiner in Oklahoma, performed an autopsy on Nicole. The external examination of Nicole’s body revealed marks caused by efforts to resuscitate her and a “hypopigmented area, meaning the skin was a little darker” on Nicole’s “left cheek, right under the left eye.” There were also two small bruises to her scalp which were revealed by opening the scalp. Dr. Balding concluded that these bruises occurred before Nicole’s death.
Dr. Balding conducted an internal exam and determined “as far as the internal organs go, there was no evidence of injury or natural disease.” There was “no evidence of intracranial hemorrhage or infection” and the brain was “normally formed and show[ed] no evidence of injury or disease.” The toxicology screen showed small amounts of over-the-counter cold medication and the presence of drugs used in resuscitation attempts but “was essentially negative ... in terms of having any relation to causing the death.”
While Dr. Balding “could find no cause of death,” he noted the death as “suspicious.” He “felt that the past history of unexplained or inadequately explained injuries in this child is a significant condition.” The autopsy report listed Nicole’s cause of death as “unknown” and the manner of death as “undetermined.” Dr. Balding opined that the autopsy findings were consistent with a death by suffocation. He also opined that he could not rule out a Sudden Infant Death Syndrome (SIDS) type death in this case. However, he did not use that diagnosis because “the injuries [to Nicole] were enough to make [him] say that [he] couldn’t use that diagnosis.”
C. Bums to Jasmine Diaz
In September 1994, several months after Nicole’s death, Appellant was transferred to Hawaii. On January 5, 1995, Appellant’s wife gave birth to a second daughter, Jasmine. On July 30, Appellant burned Jasmine’s inner left thigh with the tip of a heated cigarette lighter. This was the third reported incident of Appellant’s infant daughters suffering harm when alone with him. Appellant claimed that he accidentally dropped the lighter on Jasmine as he was trying to ignite a caterpillar or centipede that had crawled into her crib.
The next day, Appellant’s wife presented Jasmine to Dr. Elizabeth Abinsay, a pediatrician at St. Francis Medical Center-West in Ewa Beach, Hawaii, who treated Jasmine for the burn to her left thigh and also an ear infection. Dr. Abinsay evaluated the injury as a second degree burn and provided followup treatment in both August and September.

D. Further investigation into possible child abuse

After Jasmine was burned, Hawaii Child Protective Services (CPS) initiated an evaluation of Jasmine for suspected child abuse and neglect. In October 1995, Jasmine was admitted to the pediatric ward at the Tripler Army Medical Center, Hawaii, where Captain Ladd Tremaine, M.D., a board-certified pediatrician, evaluated Jasmine’s injuries to determine if they were the result of accidental or non-accidental trauma. He examined a “well healed scar on the left medial aspect of her upper thigh that had essentially a branding pattern to it, potentially three different distinct areas.” Dr. Tremaine determined that the burns were “classic branding in *84 jur[ies]” and were not incurred accidentally. As part of the evaluation, Dr. Tremaine talked to Appellant. According to Dr. Tremaine,
Specialist Diaz reported that Jasmine had been laid down to sleep that night, and when he went in to look in on her, he noticed a centipede laying in her crib. He proceeded to obtain his lighter and to chase the centipede around the bed and try to burn the centipede. While he was doing that, he reported that he’d taken Jasmine into his wife’s — -where his wife was, and his wife was in their bedroom. He went back, got Jasmine, went to the living room, reported lighting a cigarette and dropping the lighter on Jasmine’s leg.
Following Dr. Tremaine’s evaluation, CPS removed Jasmine from her parents’ custody.
At some unspecified time in 1996, Dr. Stuemky, acting as a member of the Death Review Board of Oklahoma (Death Review Board), became involved in the investigation of Nicole’s death. This is an official state board (including physicians, nurses, and members of the law enforcement community) that conducts a multi-disciplinary review of every death of a child under the age of 18 “so no deaths would escape notice.” One function of the Death Review Board is to collect all agency and medical reports and records so that local officials could have access to all information relating to the death of a child.
Based on his review of this case, Dr. Stuemky concluded that Nicole’s death was a homicide and Appellant was the perpetrator. The Death Review Board contacted the military to make sure the investigators in the Army were aware of Nicole’s previous injuries. In July 1997, Appellant was transferred to Fort Drum, New York. Mrs. Diaz remained in Hawaii to retain custody of Jasmine.
Appellant met four times with Ms. Reagan Amlin, a clinical social worker in the Family Advocacy Program dealing with high-risk families and clients at Fort Drum. In November and December 1997, Appellant sought counseling as required by the CPS in order to be reunited with Mrs. Diaz and Jasmine. The purpose of this therapy was for Appellant “to take ownership of the abuse, to take responsibility for the abuse.... ” It was also to help Appellant understand “the enormity of the consequences to the child.” At the third session, following their discussion of Jasmine, Ms. Amlin questioned Appellant about Nicole’s burn. According to Ms. Amlin:
[Appellant] indicated that ... Mrs. Diaz was asleep, it was late at night. Nicole had a cold, and he removed the child from the crib and placed her face over a steamer. He indicated that he was holding [Nicole] over the steamer with her face getting the steam. He indicated that he was doing that to help her breathe.... He indicated that [Nicole] made no movement at all, and he didn’t realize he was burning the child, and the child didn’t give any indication that [she] was being hurt.
Appellant and Ms. Amlin next discussed Nicole’s death. According to Ms. Amlin, Appellant informed her
that the night Nicole died, again, Mrs. Diaz was sleeping. He’d taken Nicole from the crib, was sitting on the sofa in the living room and, again, watching TV. He indicated ... that when he was ready to go to bed, he took the child to put her back in the crib, and it was at that time that he discovered that the child had died.
When she asked if he covered Nicole’s mouth and nostrils to see what would happen, Appellant responded, “I just want to be normal. I’m never going to get my family back. What will happen to me if I go to jail[?]” At this time, Appellant gave Ms. Amlin a “rather strange expression ... it was rather like a smirk at first.” After this session, Ms. Amlin reported Appellant to U.S. Army Criminal Investigation Command (CID).
During the fourth session, Ms. Amlin discussed the nature of the injuries to the children and the patterns she was seeing. Ms. Amlin told Appellant that she believed he killed Nicole. In response, Appellant asked, ‘What will happen to me?” and indicated he was afraid of going to jail. Appellant also indicated that “he did not know anything until he put her into the bed, and then he realized that she was dead.”
*85 Ms. Amlin told Appellant, “I’m very convinced that you killed Nicole.” Appellant paused and then said, ‘You don’t know the half of it.” Appellant started questioning what was going to happen to him and said, “I’m never going to get my family back.” Ms. Amlin “felt at that time that he started to realize that he’d said an awful lot, and that it wasn’t going to be very helpful to him as far as [CPS] went.” The fourth session concluded with Appellant getting angry and stating that he probably would not be back.
Based on these facts, on October 28, 1998, two charges were preferred against Appellant — murder of Nicole by suffocating her and aggravated assault of Jasmine by burning her on the leg with a cigarette lighter. These charges were referred to a general court-martial on February 11,1999.[2]

III. TRIAL DEVELOPMENTS RELATED TO APPELLANT’S MOTION FOR A MISTRIAL

Expert medical testimony was the centerpiece of both the prosecution and the defense. The prosecution’s case included four medical experts who testified about both the charged offenses of abuse and Appellant’s uncharged misconduct to establish a pattern of Appellant abusing his daughters. The defense relied on testimony of two medical expei’ts, including one prosecution doctor whom the defense adopted as its own witness. The defense also elicited testimony on cross-examination from two other prosecution experts to challenge the prosecution’s theory. The defense used expert testimony to bolster the Appellant’s explanation of accidental burns to both girls. Expert testimony was also used to assert “crib death” or SIDS as Nicole’s cause of death.
As Appellant did not testify at trial, both parties relied on Appellant’s pretrial statements to provide his explanation of the circumstances of the injuries and the death. In these pretrial statements, Appellant persistently denied culpability in the death of Nicole. Also, Appellant repeatedly admitted inadvertently and accidentally causing some injury to the girls, although with sometimes conflicting explanations as to the circumstances of the injuries. On one occasion, Appellant admitted that he intentionally burned Jasmine, but the defense argued his admission was to satisfy a social service agency requirement and to placate a social worker who insisted that Appellant “accept the guilt of this” and get help before Appellant could be eventually reunited with Jasmine.
Before this Court, Appellant asserts that the testimony of two government witnesses, Ms. Amlin and Dr. Stuemky, should have resulted in a mistrial. The specific testimony at issue is:
1. Ms. Amlin’s testimony that she confronted Appellant with her personal belief that Appellant killed Nicole;
2. Dr. Stuemky’s testimony as to his conclusions regarding Nicole’s death: “My conclusions were that this was a homicide death — that this was a physical abuse death. And furthermore, I felt that the perpetrator was the father.”

A Ms. Amlin’s testimony

Trial defense counsel moved in limine to prevent Ms. Amlin from rendering any opinion about what she thought happened to Nicole. The Government responded that it did not intend to elicit that opinion. However, during her testimony, Ms. Amlin, in explaining the purpose of the therapy, stated, “My job is to make sure very clearly that this individual is guilty of what he’s being accused of.” Later, Ms. Amlin indicated that she confronted Appellant with her belief that he had killed Nicole. The morning after Ms. Amlin testified, defense counsel expressed concern that Ms. Amlin had testified as to her opinion that this was a homicide when she stated, “I was convinced that he killed his daughter.” The military judge responded:
I’m going to give a limiting instruction to the effect of whatever extent the [mem *86 bers] might come to that conclusion by her testimony. That expression — I remember one. It might’ve happened more than that. It concerned me last night when I thought about it, because I think the [members] could be misled into believing that her feeling was that he did it. That expression was used in the course of her therapy to talk to her client. That wasn’t her standing up here saying “I know he did it.” I’ll give a limiting instruction. I just wanted to clarify what you were talking about.
The military judge provided the following limiting instruction concerning Ms. Amlin’s testimony:
Members of the court, yesterday afternoon you heard the testimony of Ms. Reagan Amlin. She testified about her four sessions with Specialist Diaz. She testified that during one or more of the sessions, she told Specialist Diaz that she either didn’t believe him, or she confronted him with her thoughts that a crime was committed. You members, as the voice of the community, have to decide the issues in this case based upon the evidence that’s presented to you in court. Nobody can tell you what happened. That’s your job and there are no shortcuts. There is no witness that can tell you that a crime occurred; that’s your job to determine that issue.
So to the extent that you believe that Ms. Amlin testified or implied that she believed that Specialist Diaz committed a crime, committed a murder, committed an intentional burn, you may not consider that as evidence that a crime occurred, because that’s your job. She used that technique during her therapy to talk with the client. Do you understand what I’m telling you here? You’ve got to make the decisions in this case, and there’s nobody that can shortcut your job, although I’m sure that would make it easier for you.
The members indicated they understood the instruction.

B. Dr. Stuemky’s testimony

During a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), defense counsel requested that Dr. Stuemky be instructed not to mention uncharged misconduct beyond the Government’s notice pursuant to Military Rule of Evidence 404(b) [hereinafter M.R.E.]. Defense counsel also sought to prevent Dr. Stuemky from stating that, in his opinion, Nicole’s death was a homicide, and from stating whether the Death Review Board had determined that it was child abuse or a homicide.
The military judge ruled that the doctor could testify as an expert on the ultimate issue, that Nicole’s death was a homicide, and that he could, with some limitations, testify generally about the nature and function of the Death Review Board. In making his ruling the judge stated:
Concerning the defense’s objection to the testimony of Dr. Stuemky as to the ultimate issue, I’m denying that motion in limine. I find that his testimony, given the case to this point, is material, and I believe it’s probative. I believe he has the qualifications to do it, from what I’ve been told by counsel. I believe that the information he relied upon is information that would put him in a unique position to be able to make that determination. Applying a[n] [M.R.E.] 403 balancing test, I find that the probative value of the evidence is not substantially outweighed by the likelihood of harm to the accused.
Concerning his testimony about this [Death Review Board], I’m going to allow him to testify about the [Death Review Board], why it was created, what they do. I’m not going to let him talk about any statistics concerning the [Death Review Board], as to how many times they’re correct, or how many times they’re wrong, or anything like that. I will allow him to testify about his background with the [Death Review Board], how many investigations he’s conducted and he’s been involved in.
Concerning his testimony about the basis for his determination, I believe he has a sufficient basis to form the opinion that he’s going to offer. I would tell the defense, however, that depending on what their cross is, and how they attack him, *87 you may open the door as to his testifying about other evidence that he considered.
Government counsel represented to the court that he would speak with Dr. Stuemky to “make it very clear to him as to what [he] can or cannot testily to.” Also, immediately before Dr. Stuemky’s testimony, the judge gave the limiting instruction regarding the limitations on Ms. Amlin’s testimony including the admonition, “There is no witness that can tell you that a crime occurred.”
Dr. Stuemky testified about his role in the Child Protection Committee and his initial involvement with Nicole. He explained that he had examined Nicole after she had been burned in January 1993. He first testified regarding her injuries. He told the panel that he noticed the bruises on Nicole’s face and her fractured posterior ribs. He explained the significance of these injuries in children and opined that in small children the only cause of posterior rib fractures is child abuse.
Next, Dr. Stuemky testified about his involvement in the review of Nicole’s death by the Death Review Board. He explained how the Death Review Board obtained and evaluated all the information relating to Nicole’s early injuries including her burn and information relating to her death. He testified in detail about SIDS. He explained that the National Institutes of Health has defined SIDS as “a sudden, unexplained death in an infant under 12 months of age in whom an autopsy has in fact been performed, and no other cause or abnormalities are noted, and in whom an adequate death scene investigation has been performed; and in whom all associated records and that sort of thing are evaluated by the appropriate agencies.” He stated that “SIDS is primarily an event that occurs in infants under 6 months of age. Ninety percent of SIDS deaths are under 6 months of age ... with the peak time of SIDS deaths between 2-4 months of age.”
Interrupting the direct examination, the military judge suggested taking a break. After a few more questions, trial counsel acquiesced and requested a recess. Before the trial resumed and in an Article 39(a) session, the judge sua sponte revisited his ruling on the limits of Dr. Stuemky’s testimony stating:
Earlier when I ruled about the ultimate conclusion, I want to make clear that you understand what my ruling is. My ruling is not that this witness can say, “Specialist Diaz murdered his daughter.” My ruling does allow you to ask whether the injuries are consistent with a child abuse death; whether he has an opinion as to whether the injuries were caused by child abuse; whether he has an opinion as to whether this was a SIDS death, or inconsistent with a SIDS death. I’ll let him do that. I want to make sure you understand that my ruling did not say that he could stand up there and point a finger at specialist Diaz and say, “He killed his daughter.” Do you understand my prior ruling?
Assistant trial counsel responded that he understood the ruling.
Dr. Stuemky then continued his testimony discussing the factors the Death Review Board considers when evaluating a possible SIDS death in general and the evidence relating to Nicole’s death in particular. Dr. Stuemky stated, “Our concern is that something had to have caused this death. And our concern is that it’s most likely consistent with suffocation.”
At this point, the following occurred in assistant trial counsel’s questioning of Dr. Stuemky:
Q. Did you come to any conclusion with regard to your review of Nicole’s death and the reports?
A. Yeah, our Child Protective Team—
Q. Did you come to any conclusions, sir, by your review?
A. Yes, I did.
Q. What were your conclusions?
A. My conclusions were that this was a homicide death — this was a physical abuse death. And furthermore, I felt that the perpetrator was the father. *88 Your Honor, we move for a mistrial, that’s strike three. That’s the third time we have moved in limine to exclude testimony from a government witness that ... blurted it out. Your Honor, this is particularly disturbing because you specifically told [Government counsel] that the witness could not say that. We move for an immediate mistrial.
*87 Assistant defense counsel immediately asked for an Article 39(a) session. In closed session, the defense asserted the following:
*88 Trial counsel responded.
Yes, sir, we object to moving for a mistrial. That was totally unexpected. I did, during the last recess, talk with Dr. Stuemky and gave clear instructions on what he could and could not say, and that was one of the matters that we spoke of. He could talk about exactly as you had instructed — prior to the last break, I went out and reiterated everything. I stated that he could say it was consistent with child abuse. Again, Your Honor, I did not expect that. I did instruct that witness he could not go there.
Defense counsel responded, ‘Your Honor, everybody expected it. We talked about it ahead of time. Everybody expected that. That is highly prejudicial, Your Honor, and there’s no way to cure it.”
After an eleven minute recess, the military judge immediately provided the following curative instructions to the members:
Members of the court, early on in this trial and during the ease on several occasions, I’ve told you that you have to decide the facts in this case, and you have to make a determination as to whether a crime occurred. You have to make a determination as to the believability or credibility of witnesses. And you have to follow my instructions____ [Y]ou all assured me that you could do that.
I’m going to give you some instructions concerning expert testimony. An expert - a person is allowed to testify as an expert because his testimony may be helpful to you in coming to conclusions about issues. The witness you’ve been hearing has been qualified as an expert in a specific discipline because his knowledge, skill, experience, training or education may assist you in understanding the evidence, or in determining a fact in issue. But [t]he point is that you have to determine the fact in issue. Do you understand that?
[Affirmative responses from the Members]
You are not required to accept the testimony of an expert witness or give it any more or less weight than that of an ordinary witness. But you should consider the expert’s experience and qualifications in the specific area.
Expert witnesses are allowed to render opinions, and those opinions are only allowed if they’re helpful to you, the fact finder. But again, bear in mind that you have the ultimate determination as to a conclusion about the issues in the case.
An expert cannot tell you that he thinks a crime occurred, because that’s not helpful to you, because you have to decide that. An expert witness cannot tell you that a witness is lying or truthful, or he cannot even tell you that a crime occurred. Because you have to decide that based on all the evidence, and only the evidence, that’s been presented in the courtroom. Do you understand that?
[Affirmative responses from the Members] To the extent that Dr. Stuemky opined that he thought a crime occurred, and that a particular specific person committed that crime, you cannot consider that, because that’s not helpful to you. You have to make that decision. Do you understand that?
[Affirmative responses from the Members]
As I told you earlier this morning, there’s nobody that can help you in that regard, because you have to make your decision based on the evidence that’s presented to you here in court. Nobody else has the unique situation of being present to hear all the evidence in court. Do you understand what I’m telling you?
[Affirmative responses from the Members]
I’m telling you that you must disregard any testimony about whether a crime occurred, or whether this soldier committed a crime. Do you understand that?
[Affirmative responses from the Members]
And you can’t consider that for any reason during your deliberations. Do you understand that?
*89 [Affirmative responses from the Members]
I’ve gotten affirmative responses by every member to this point.
You can consider evidence that certain— as to an opinion about whether injuries were consistent with SIDS or not consistent with SIDS, or whether injuries were consistent with a child abuse-type death. But you cannot consider any testimony as to what this witness thought as to who did it. Do you understand that?
The members indicated they would follow the instructions. The judge then individually questioned each member as to whether they could comply with the instructions. Every member indicated that they would follow the instructions. At this point, without other comment or ruling, the judge denied the defense motion for a mistrial.
However, this matter of Dr. Stuemk/s testimony was not closed. While the members were deliberating, assistant defense counsel made the following request of the judge:
I’d ask the court to recall Dr. Stuemky to testify outside the presence of the members as to why he intentionally disregarded a warning of the court and went beyond permissible testimony. I thought about this last night, Your Honor, and there’s really only two possibilities, either he wasn’t warned or he deliberately ignored that warning. [Government Counsel] has represented to the court — and I have no reason to doubt it — that he warned Dr. Stuemky. If Dr. Stuemky deliberately ignored a warning of the court, the court ought to consider whether or not he is in contempt. I think he ought to be recalled for this purpose and he should be called to explain why he ignored explicit instructions from the court.
The military judge denied this request. After deliberating for almost six hours, the members convicted Appellant of both offenses.

TV. DISCUSSION A. The error

The authority of expert testimony is well established. Judge Wiss, speaking for this Court, identified the general parameters in the evidentiary rules for the admissibility of expert testimony.
Liberal standards for admissibility of expert testimony have been codified. [M.R.E.s] 702-05. Trial courts have seen, therefore, a veritable explosion in use of expert testimony. Our Court is concerned with the so-called “battle of the experts,” which is a waste of time, unnecessary, or confusing. [M.R.E.] 403 is the appropriate tool for a military judge to use to handle this problem.
[M.R.E.s] 702-705 and 403 operate to establish a simple four-part test for admissibility of expert testimony: (1) Was the witness “qualified to testify as an expert”? (2) Was the testimony “within the limits of [the expert’s] expertise”? (3) Was the “expert opinion based on a sufficient factual basis to make it relevant”?, and (4) “Does the danger of unfair prejudice created by the testimony outweigh its probative value?”
United States v. Banks, 36 M.J. 150, 160-61 (C.M.A.1992) (citations and footnotes omitted). These rules reflect the intuitive idea that experts are neither omnipotent nor omniscient.
An expert witness may not opine concerning the guilt or innocence of the accused. See United States v. Birdsall, 47 M.J. 404, 409 (C.A.A.F.1998); United States v. Cacy, 43 M.J. 214, 217 (C.A.A.F.1995); United States v. Suarez, 35 M.J. 374, 376 (C.M.A. 1992); United States v. Meeks, 35 M.J. 64 (C.M.A.1992). The analysis to M.R.E. 704 expressly states, “The Rule does not permit the witness to testify as to his or her opinion as to the guilt or innocence of the accused .... ” Manual for Courts-Martial, United States (2002 ed.), Analysis of the Military Rules of Evidence A22-50.
The limits on expert opinion are rooted in recognition that the expert lacks “specialized knowledge” to determine if the victim or witness is telling the truth and respect for the member’s exclusive function to weigh evidence and determine credibility. See Birdsall, 47 M.J. at 410. The position of this *90 Court on these limitations is consistent with well-established practice in federal civilian trial courts. Id.
The admonition we have provided in the prosecution of child sexual abuse cases is equally applicable to the use of all experts: “When using the testimony of expert witnesses ..., trial practitioners ‘must walk a fine line.’ ” Cacy, 43 M.J. at 217-18 (citation omitted). Condemning impermissible expert opinion, this Court stated that such testimony that opines that a crime has been committed and that a particular person did it “crosses the line of proper medical testimony.” Birdsall, 47 M.J. at 410 (error to opine that sons were “victims of incest by their father”).
It is clear to this Court, as it was to the trial judge and the lower court, that the testimony of Dr. Stuemky was improper when he opined that Nicole was the victim of a homicide and that Appellant was the perpetrator. Diaz, 56 M.J. at 801. Dr. Stuemky improperly testified as to his opinion of the guilt of Appellant. Likewise, it is clear to this Court, as it was to the military judge when he delivered his limiting instruction following Ms. Amlin’s testimony, that her testimony was improper to the extent that it implied her belief that Appellant murdered Nicole. This testimony usurped the panel’s exclusive function to weigh evidence and determine guilt or innocence. See id.

B. The remedy

In light of this error, the decisional issue before this Court is the remedy: Could the trial proceed with a curative instruction addressing Dr. Stuemky’s testimony, or was either a full or partial mistrial a necessary remedy? In this context, we focus on the more egregious error resulting from Dr. Stuemky’s testimony, and we consider the error as to Ms. Amlin’s testimony in terms of its impact on the prejudice from Dr. Stuemky’s testimony.
Rule for Courts-Martial 915 (Mistrial) [hereinafter R.C.M.], states in part:
(a) In general. The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings. A mistrial may be declared as to some or all charges, and as to the entire proceedings or as to only the proceedings after findings.
The discussion to R.C.M. 915(a) cautions that,
The power to grant a mistrial should be used with great caution, under urgent circumstances, and for plain and obvious reasons. As examples, a mistrial may be appropriate when inadmissible matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members[.]
In United States v. Dancy, 38 M.J. 1 (C.M.A.1993), this Court recognized that a mistrial is an unusual and disfavored remedy. It should be applied only as a last resort to protect the guarantee for a fair trial. We explained:
Declaration of a mistrial is a drastic remedy, and such relief will be granted only to prevent manifest injustice against the accused. It is appropriate only whenever circumstances arise that cast substantial doubt upon the fairness or impartiality of the trial.
Id. at 6 (citations and internal quotes omitted).
A military judge has “considerable latitude in determining when to grant a mistrial.” United States v. Seward, 49 M.J. 369, 371 (C.A.A.F.1998). This Court will not reverse the military judge’s decision absent clear evidence of abuse of discretion. Dancy, 38 M.J. at 6; United States v. Rushatz, 31 M.J. 450 (C.M.A.1990). Our deference to the military judge’s decision on a mistrial is consistent with other federal practice addressing this matter as reflected in this statement by the First Circuit:
[T]he trial court has a superior point of vantage, and ... it is only rarely — and in extremely compelling circumstances — that an appellate panel, informed by a cold record, will venture to reverse a trial judge’s on-the-spot decision____ [A] mistrial is viewed as a last resort, only to be implemented if the taint is ineradicable, *91 that is, only if the trial judge believes that the jury’s exposure to the evidence is likely to prove beyond realistic hope of repair.
United States v. Freeman, 208 F.3d 332, 339 (1st Cir.2000) (citations and internal quotes omitted).
The challenge for both the trial judge and the appellate court is to determine the prejudicial impact of an error. In United States v. Pastor, Judge Cook focused on the difficulty of this task stating,
Assessment of the probable impact of inadmissible evidence upon the court members is always difficult. Sometimes an instruction to disregard the inadmissible evidence is sufficient assurance that it will not be weighed against the accused; other times the nature of the evidence is such that it is not likely to be erased from the minds of the court members. Each situation must be judged on its own facts.
8 M.J. 280, 284 (C.M.A.1980). Judge Cook concluded that this judgment is rooted in a simple “tolerable” risk assessment that the members would be able to put aside the inadmissible evidence. Id.
In the present ease, the judge denied the defense motion for a mistrial without stating on the record his findings of fact or legal analysis to support this ruling. However, the judge’s actions in giving a curative instruction and conducting individual voir dire reveal that he concluded that this remedial action was sufficient to ensure that the members would be able to put aside the inadmissible evidence.
Considering the facts of this case, we conclude that the military judge abused his discretion in his ruling that the remedial action was sufficient and in refusing to declare a mistrial. The significance of this error is best revealed by examining why a mistrial was necessary as to each charged offense— the murder of Nicole and the aggravated assault of Jasmine.

1. Mistrial as to alleged murder of Nicole

a. Prejudicial impact of the inadmissible evidence

First, the judge misapprehended the prejudicial impact of Dr. Stuemky’s inadmissible testimony. The two central issues as to Nicole’s death were the cause of her death (homicide or natural causes) and, if homicide, the identity of the perpetrator. The prosecution asserted that Appellant murdered Nicole by suffocation, relying primarily on the fact that Appellant was alone with Nicole when she died and that Appellant said she was not breathing when he got up from the couch. In his pretrial statements, Appellant adamantly and repeatedly denied any culpability in her death. The defense argued that Nicole’s death was the possible result of SIDS.
Dr. Stuemky was the key prosecution witness regarding both these issues. Because of his unique position at Children’s Hospital and his involvement with Nicole’s case over several years, Dr. Stuemky’s testimony was important in both breadth and depth. He opined that Nicole did not die a natural death, but that her death was a homicide. He based this conclusion on his findings that her death was consistent with child abuse, inconsistent with SIDS, and that the autopsy report was consistent with the conclusion that she had been suffocated. He also expressly identified Appellant as the perpetrator.
The significance of his improper testimony is clear from several factors. Dr. Stuemky had a unique, authoritative role in this case as an expert witness. His extensive experience and multifaceted career in academia and medical practice, as well as his positions on the Child Protection Committee and the Death Review Board, bolstered his credibility. He was the principal expert witness to establish the alleged pattern of abuse and to rebut the defense argument that Nicole possibly died of SIDS. Finally, the trial counsel repeatedly relied on Dr. Stuemky’s testimony in opening statement and initial and rebuttal closing arguments. Building upon Dr. Stuemky’s credentials and involvement in the case, trial counsel used his testimony to provide details of injuries and abuse, to explain Nicole’s death, and to establish a pattern of Appellant’s abuse of his daughters.
We reject the lower court’s assertion that “there is less to Dr. Stuemky’s statement than might appear at first blush.” Diaz, 56 *92 M.J. at 802. The lower court reasoned that identity of the perpetrator was not an issue in this case because of Appellant’s pretrial admissions that he was alone with Nicole when she died. The court further noted that Dr. Stuemky’s opinion was based on the fact that Nicole did not die of natural causes. Id. Dr. Stuemky’s testimony identifying Appellant as a perpetrator violated a fundamental rule of law that experts may not testify as to guilt or innocence. His testimony was particularly egregious as the defense filed a motion to exclude this testimony, the judge expressly ruled that this testimony was improper, and trial counsel stated he had informed the witness of the judge’s ruling to limit the witness’s testimony.
As the cause of Nicole’s death was a threshold issue before the panel, Dr. Stuemky’s identifying Appellant as the perpetrator could be viewed by the members as bolstering his assertion that she was murdered and did not die a natural death. See United States v. Boyd, 55 F.3d 667, 672 (D.C.Cir.1995)(“[T]he jurors may rely on the purported expertise of the Government witness to cure the ambiguity that they face____ There would be little need for a trial before a jury if an expert is allowed simply to declare the defendant’s guilt.”). Dr. Stuemky’s testimony was presented as a definitive resolution of the issues of both cause of death and identity of the perpetrator. In this homicide prosecution, the prejudicial impact of linking these two issues was immediate, direct, and powerful, as it was an impermissible expert opinion of Appellant’s guilt.
Second, the judge failed to consider adequately the context of Dr. Stuemky’s impermissible expert testimony. Dr. Stuemky’s inadmissible opinion testimony immediately followed the testimony of Ms. Amlin that she “was convinced that he killed his daughter.” Although the judge instructed the panel not to consider her belief that Appellant committed a crime, we consider the juxtaposition of Dr. Stuemky’s inadmissible testimony and Ms. Amlin's testimony to have had a cumulative prejudicial impact on the panel. Regarding the other defense challenges to the admission of Ms. Amlin’s testimony, we have assumed without deciding, only for purposes of this appeal, that her testimony was otherwise admissible.

b. Inadequacy of the curative instruction

In light of these trial developments, we reject the judge’s implicit ruling that a curative instruction could purge prejudice from this error. After Dr. Stuemky identified Appellant as the murderer, the judge made a futile attempt to “unring the bell.” See United States v. Armstrong, 53 M.J. 76, 82 (C.A.A.F.2000) (citations omitted). A curative instruction is the preferred remedy, and the granting of a mistrial is an extreme remedy which should only be done when “inadmissible matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members.” R.C.M. 915(a) discussion. Recently, this Court stated, “We have often held that a curative instruction can render an error harmless.” Armstrong, 53 M.J. at 82 (citations omitted). However, in United States v. Rosser, this Court reaffirmed that a curative instruction is not a perfunctory exercise, stating:
It is clear that the mantle of judicial discretion will not protect a decision based on the judge’s arbitrary opinions as to what constitutes a fair court-martial. Likewise, the military judge must engage in a sufficient inquiry as a matter of law to uncover sufficient facts to decide the issue before him.
6 M.J. 267, 271 (C.M.A.1979). We encourage voir dire to ensure the members not only understand but also will adhere to the curative instructions. Under some circumstances, however, an instruction followed by voir dire of the members does not cure the prejudice toward the accused and the judge must grant a mistrial. In such instances, the judge’s failure to do so is an abuse of discretion.
Here, as in Armstrong, we have “grave doubts” about the military judge’s ability to “unring the bell.” We view the instructions regarding the inadmissible evidence as both inadequate and confusing. Also, we do not consider that the Government’s case was as strong as asserted by the lower court.
*93 The instruction was inadequate and confusing in several facets. Given the inflammatory nature of Dr. Stuemky’s impermissible testimony, the military judge should have immediately instructed the members regarding the impropriety of Dr. Stuemky’s testimony that Nicole was murdered and that Appellant was the perpetrator. Instead, the military judge then surrounded his admonition not to consider Dr. Stuemky’s impermissible testimony with an instruction telling the members how powerful expert testimony is and an explanation that the impermissible portion of Dr. Stuemky’s testimony was “not helpful.” In this context, the impact of the military judge’s admonition not to consider the impermissible portion of Dr. Stuemky’s testimony was significantly diluted.
Furthermore, the instruction was confusing because it failed to provide proper guidance for the panel’s deliberations. We note that the instruction was inconsistent with the prior ruling of the judge as to the scope of Dr. Stuemky’s testimony. Initially, the judge ruled, outside of the presence of the members, that Dr. Stuemky could testify that Nicole’s death was a homicide. He also ruled that Dr. Stuemky could testify that the injuries were caused by child abuse. However, when the judge provided the curative instruction to the members, the judge stated that Dr. Stuemky could not opine that a crime occurred. In light of the judge’s ruling and the testimony at trial, the judge had an obligation to be specific and precise. His failure to do so here rendered the instruction ineffective. See United States v. Jackson, 6 M.J. 261, 263 n. 5 (C.M.A.1979); United States v. Groce, 3 M.J. 369, 370-71 (C.M.A. 1977).
Finally, we doubt the efficacy of the curative instruction. Instructed contemporaneously with the testimony of Ms. Amlin and Dr. Stuemky, the panel was given a confusing mixed signal. Despite instructions that witnesses could not testify that the accused committed a crime, the panel heard both witnesses plainly identify Appellant as the perpetrator of a murder. The members could hardly appreciate the gravity of the error or the importance of the limiting instructions where it appeared that such testimony was permissible. There are situations where the judge can “unring the bell” but we do not believe he did so in this instance.
c. Consideration of other evidence including the uncharged misconduct
We do not evaluate these trial developments in a vacuum, but are compelled to consider all the evidence in measuring the impact of any error. Accordingly, we next consider all the evidence in the process of evaluating whether the limiting instructions provided an adequate remedy. See United States v. Weeks, 20 M.J. 22, 25 (C.M.A.1985).
Although Appellant asserted he was alone with Nicole at the time of her death, in his pretrial statements Appellant repeatedly denied his culpability. There were no eyewitnesses to Nicole’s death. There was no forensic evidence that directly implicated Appellant in the death of the child. The autopsy report listed the cause of death as unknown.
The prosecution’s case was built on circumstantial evidence. The linchpin of this ease was the prosecution’s strategy to establish a pattern of abuse by Appellant against his infant daughters. The lower court also relied on the “doctrine of chances” as a theory to implicate Appellant. See Diaz, 56 M.J. at 802 (quoting United States v. Tyndale, 56 M.J. 209, 213 (C.A.A.F.2001)(it “is unlikely a defendant would be repeatedly, innocently, involved in similar, suspicious circumstances.”)). To support this pattern of abuse theory, the prosecution relied upon prior acts of uncharged misconduct relating to injuries to Nicole. Therefore, we will carefully examine the uncharged misconduct evidence.
Recently, in United States v. Humpherys, this Court summarized the legal requirements and test for the admissibility of uncharged misconduct stating in part:
“[Ejvidence which is offered simply to prove that an accused is a bad person is not admissible” under [M.R.E.] 404(b), Manual for Courts-Martial, United States (2000 ed.). United States v. Reynolds, 29 MJ 105, 109 (CMA 1989). [M.R.E.] 404(b), *94 however, is a rule of inclusion, not exclusion. “[T]he sole test under [M.R.E.] 404(b) is whether the evidence of the misconduct is offered for some purpose other than to demonstrate the accused’s predisposition to crime ____” United States v. Tanksley, 54 MJ 169, 175 (2000)(quoting United States v. Castillo, 29 MJ 145, 150 (CMA 1989)). As the Supreme Court stated when speaking of [M.R.E.] 404(b)’s counterpart, Fed.R.Evid. 404(b): “The threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character.” Huddleston v. United States, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). In addition to having a proper purpose, the proffered evidence must meet the standards of [M.R.E.] 104(b), 402, and 403. See Reynolds, 29 MJ at 109.
Reflecting the combined requirements of these rules, our Court applies a three-pronged test for determining admissibility of other-acts evidence under [M.R.E.] 404(b). See id. We evaluate: (1) whether “the evidence reasonably supports a finding by the court members that appellant committed prior crimes, wrongs or acts”; (2) “[w]hat fact of consequence is made more or less probable by the existence of this evidence”; and (3) whether “the probative value [is] substantially outweighed by the danger of unfair prejudiee[.]” Id. (internal quotations, ellipses, and citations omitted); see also Tanksley, 54 MJ at 176-77. “If the evidence fails any of the three tests, it is inadmissible.” United States v. Cousins, 35 MJ 70, 74 (CMA 1992); accord Reynolds, 29 MJ at 109.
57 M.J. 83, 90-91 (C.A.A.F.2002) (footnote omitted).
The uncharged misconduct evidence related to alleged abuse of Nicole and included leg and rib fractures, bruises, and the burn to her face. Under the three-pronged test set forth in Reynolds, we hold that the military judge abused his discretion by admitting all the uncharged misconduct. Under the circumstances of the ease, the prejudice from this error exacerbated the prejudice from Dr. Stuemky’s testimony.
The trial evidence was insufficient to establish that Appellant inflicted the leg and rib fractures and the bruise to Nicole’s chest. There is minimal evidence to establish when and how Nicole suffered the fractured ribs, broken leg, and the bruise to her chest. Also, there was no evidence to establish who was culpable for the injuries. While Appellant had access to Nicole, he was by no means the only one with the opportunity to inflict these injuries. Appellant’s wife was the primary caregiver and testified that other people had access to Nicole, including several babysitters and Appellant’s younger brother. The Government’s written response to the defense motion to suppress this evidence effectively conceded the lack of proof to implicate Appellant in those injuries. Trial counsel stated, “Evidence of the broken bones and bruises is not being offered to show that the accused actually caused these injuries, but to explain the reasoning behind Dr. Stuemky’s opinion that Nicole was an abused child.” In essence, we view all the factors relied on by the prosecution as “rather generic” rather than “highly probative of identity.” See United States v. Ferguson, 28 M.J. 104 (C.M.A.1989).
We recognize that “when the crime is one of infanticide or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime.” United States v. Woods, 484 F.2d 127, 133 (4th Cir.1973). However, there must be sufficient evidence to establish Appellant’s culpability regarding an incident of alleged misconduct in order to establish the relevance of that incident. Each alleged incident of uncharged misconduct must pass through the “Reynolds filter.” The prosecution cannot merely lump together a series of incidents and assert that together they establish Appellant committed each act of abuse. Although the standard for the first prong of the test for admissibility of uncharged misconduct is low, we find that standard was not met here. United States v. Browning, 54 M.J. 1, 6 (C.A.A.F.2000). It was error to admit evidence regarding the broken bones and the bruise to Nicole’s chest, as the evi *95 dence fails to meet the first prong of the Reynolds test.
Furthermore, regarding the uncharged misconduct of the burn to Nicole, we note that the defense supported its explanation of this incident as an accident by presenting testimony from the chairman and Chief Executive Officer of the vaporizer manufacturer. He testified by stipulation that he had “received complaints from customers who were burned by the steam coming out of one of [his company’s] steam vaporizers. [He has] even burned [himself] several times accidentally by allowing [his] arm to go through the steam coming from a vaporizer.”
We reject the prosecution’s assertion that this incident is relevant under prong two of Reynolds to the charged offense of Appellant murdering Nicole. With regard to the murder charge, Appellant asserted that Nicole died from unexplained circumstances. Appellant did not assert that he had done any act that caused harm to Nicole. He did not assert either accident or mistake. Appellant’s defense was a general denial.
The prosecution attempted to “create an act by Appellant,” an accidental injury to Nicole, and then to rebut it by offering uncharged misconduct. The root of the problem with this prosecution strategy is that there was no fact of consequence or act of Appellant for the prosecution to rebut or explain. The prosecution was not permitted to “create an act by Appellant” and then to offer uncharged misconduct evidence to rebut or explain it. See United States v. Graham, 50 M.J. 56 (C.A.A.F.1999). Simply stated, the prosecution cannot introduce uncharged misconduct to rebut a defense that was never raised or presented by the defense. Such evidentiary bootstrapping is not permitted. See United States v. Maxwell, 21 M.J. 229, 230 (C.M.A.1986)(“[T]he prosecution cannot turn a defense witness into a character witness through cross-examination and, thereby, bootstrap otherwise inadmissible evidence into the case.”); Ferguson, 28 M.J. at 109 (“Two bodies of otherwise inadmissible testimony cannot bootstrap each other into admissibility.”).[3]
Finally, in light of the egregious error in Dr. Stuemky’s testimony and the related error in Ms. Amlin’s testimony, in the context of the prosecution strategy of relying on a pattern of abuse, we have grave doubt that the panel could separate and fairly consider the uncharged and charged misconduct. Under the prosecution theory, these events of uncharged and charged misconduct were inextricably intertwined. This draws into question whether a panel could disregard Dr. Stuemky’s expert testimony that Appellant murdered Nicole but consider, for the proper purpose only, the uncharged evidence of Appellant’s abusing her.
As a result of the exposure of the members to Dr. Stuemky’s powerful expert testimony that Appellant murdered his daughter, we are left with grave doubt that the panel could fairly evaluate the uncharged misconduct evidence. Simply stated, we believe that the panel’s hearing Dr. Stuemky’s testimony so fueled the prejudicial impact of the uncharged misconduct evidence that it rendered it inadmissible under the third prong of Reynolds. Accordingly, we hold that the evidence of uncharged misconduct was inadmissible for the purpose of showing *96 a pattern of abuse. We express no opinion as to whether the evidence of prior uncharged acts might be otherwise admissible for another purpose at a rehearing.
Without the uncharged misconduct, the Government’s ease is substantially weakened.. Even assuming, however, that the prior acts evidence was admissible under M.R.E. 404(b), the strength of the Government’s case remains questionable. Therefore, our view of the entire ease confirms our conclusion that it was error for the judge to deny the defense motion for a mistrial with regard to the alleged homicide.
2. Mistrial as to alleged aggravated assault of Jasmine
The R.C.M.S specifically authorize a judge to declare a mistrial as to only some of the proceedings. See R.C.M. 915. This Court also has sanctioned this remedy. See Rosser, 6 M.J. at 270-71. However, in the present case, we are not faced with the situation where the judge granted a partial mistrial and dismissed the murder charge. On the contrary, Appellant’s trial proceeded on both charged offenses. Having concluded that a mistrial as to the murder charge was required, we are left with the question of whether the members could fairly decide whether Appellant committed an alleged aggravated assault by intentionally burning Jasmine.
As Appellant admitted burning Jasmine, the panel decision regarding this offense boiled down to one issue — was the burn an intentional act or accident? The focus of our inquiry, therefore, is how Dr. Stuemky’s testimony labeling Appellant as Nicole’s murderer impacted the panel’s eventual decision.
As we evaluate the impact of Dr. Stuemky’s testimony in the context of this case, as exacerbated by Ms. Amlin’s improper testimony and by the evidence of uncharged misconduct, we again focus on the prosecution strategy to use both the charged and uncharged misconduct to establish a pattern of abuse by Appellant against his infant daughters. While the record reveals this strategy permeated the prosecution’s ease, the primacy of this strategy is reflected in the opening fine of the prosecutor’s rebuttal argument, “Members of the panel, there is a pattern here.” Nowhere is this pattern of abuse strategy more evident than in this argument when assistant trial counsel responded to the defense assertion that there was no intentional assault of Jasmine. Assistant trial counsel stated to the members, “Anyone of us can look at this picture and see the evidence of abuse [Prosecution Exhibit 10].” To illustrate his point, trial counsel showed the members the picture of Nicole’s burn, Prosecution Exhibit 10, rather than the picture of Jasmine’s burn, Prosecution Exhibit 3. This example illustrates how the prosecution interwove the two charged offenses and alleged uncharged misconduct to accomplish the prosecution strategy of establishing Appellant’s pattern of abuse.
Similarly, the lower court recognized the prosecution’s strategy and expressly relied on evidence of Appellant’s pattern of abuse to sustain the findings. Diaz, 56 M.J. at 798. The lower court’s reliance on this evidence supports our view that the prosecution of these two offenses was inextricably intertwined.
Another important trial development we have considered was the improper testimony of Dr. Tremaine, with regard to Jasmine’s burn, that Appellant was “listed as the prime perpetrator, or the perpetrator, of this non-accidental trauma.” The admission of this evidence was plain error. See Birdsall, 47 M.J. at 409-10. This error, in light of Dr. Stuemky’s and Ms. Amlin’s inadmissible testimony, further calls into question the fairness of this trial. This fact of a third witness identifying Appellant as the perpetrator in the other charged offense, the burn to Jasmine, raises the question of how many times this Court will permit the prosecution to “ring the bell.” We simply conclude we cannot condone this error for a third time.
This inadmissible evidence from Dr. Stuemky, Dr. Tremaine, and Ms. Amlin magnified the impact of these errors on the members in a case where the panel requested clarifying instructions from the judge and deliberated on findings for almost six hours. *97 Each evidentiary error was significant, and together they denied Appellant a fair trial. See Birdsall, 47 M.J. at 410 (plain error for expert to act as human lie detector); United States v. Garza, 608 F.2d 659, 664-66 (5th Cir.1979)(it was plain error for the prosecutor to “testify” as an expert witness and opine in closing argument as to the guilt or innocence of the accused); but see United States v. Waldman, 310 F.3d 1074, 1078 (8th Cir.2002)(where there was substantial evidence of guilt, no plain error for expert to opine that accused “had an intent to kill a policeman”).
In making this decision, we again specifically consider if the uncharged misconduct relating to Nicole’s burn and the other evidence impheating Appellant in Jasmine’s burns render harmless any error in the admission of Dr. Stuemky’s testimony. In so doing, we again conclude that the uncharged misconduct relating to Nicole’s burn would be inadmissible. The panel’s hearing Dr. Stuemky’s testimony so exacerbated the prejudicial impact of the uncharged misconduct evidence relating to Nicole’s burn that it rendered this evidence inadmissible under the third prong of Reynolds. Viewing the case as it was prosecuted, we find the circumstances and context of this serious error cast substantial doubt upon the fairness and impartiality of the trial. We are left with grave doubt that the members could fairly and impartially decide whether Appellant committed an alleged aggravated assault on Jasmine by intentionally burning her. This decision is rooted in our understanding of human nature and the purpose of a criminal trial. There are limits to what a panel can be expected to disregard. The human mind of a member is not a blackboard where the judge, by a curative instruction, can irrevocably erase powerful inadmissible evidence.
We do not believe that the members could have put out of their minds that three witnesses labeled Appellant guilty of the charged offenses. While we have acknowledged the evidence impheating Appellant, we reaffirm that guilt is established only by a fair trial. In the present case, Appellant was denied a fair trial. A partial mistrial is not an appropriate remedy in this ease. See United States v. Harriston, 329 F.3d 779, 789 (11th Cir.2003).
In summary, we hold that the trial judge erred in not granting a mistrial as to both charged offenses. Similarly, the Court of Criminal Appeals erred in affirming the findings and sentence.

Decision

For these reasons, the decision of the United States Army Court of Criminal Appeals is reversed. The findings and sentence are set aside. A rehearing is authorized.
*98 [[Image here]]

. We heard oral argument in this case at New England School of Law, Boston, Massachusetts, on April 1, 2003, as part of "Project Outreach.” See United States v. Allen, 34 M.J. 228, 229 n. 1 (C.M.A.1992).

. By this time, the prosecution of Appellant for the November 1992 burning of Nicole with the vaporizer was barred by the statute of limitations. See Article 43(b)(1), Uniform Code of Military Justice, 10 U.S.C. § 843(b)(1) (2000)(five-year statute of limitations).

. We disagree with the assertion in the separate opinion that this case is similar to Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). In our view, the nature, quantum, and quality of the evidence of intentional physical abuse in McGuire was significantly different from this case. Most importantly, McGuire is not a valid precedent for deciding an issue involving Military Rule of Evidence 404(b). McGuire involved a petition for habeas corpus. The Supreme Court specifically declined to decide whether the California courts correctly applied the rules of evidence, holding that review of the evidentiary question "is no part of a federal court's habeas review of a state conviction.” 502 U.S. at 67, 112 S.Ct. 475. The only question addressed by the Supreme Court was whether the trial judge’s ruling on the admissibility of "bad acts evidence” and the limiting instruction regarding that evidence "so infected the entire trial that the resulting conviction violated due process." Id. at 72, 112 S.Ct. 475 (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). The Supreme Court resolved this narrow constitutional issue against the petitioner without deciding the evidentiary issue.