*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
TANG, LAWRENCE, and STEPHENS
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Guillermo CABRERA**
Lance Corporal (E-3), U.S. Marine Corps
Appellant

**No. 201800327**

Decided: 12 May 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Brian E. Kasprzyk (mistrial)
John L. Ferriter (arraignment)
Mark D. Sameit (motions)
Matthew J. Kent (motions, trial)

Sentence adjudged 8 March 2018 by a general court-martial convened at Marine Corps Air Station Miramar, California, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, confinement for seven years, forfeiture of all pay and allowances, and a dishonorable discharge.

For Appellant:
*Catherine M. Cherkasky, Esq.*
*Captain Nicholas S. Mote, USMC*

For Appellee:
*Lieutenant George R. Lewis, JAGC, USN*
*Lieutenant Kimberly Rios, JAGC, USN*

Senior Judge TANG delivered the opinion of the Court, in which Judges LAWRENCE and STEPHENS joined.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

TANG, Senior Judge:

Appellant was convicted, contrary to his pleas, of two specifications of Article 120, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 920 (2012). Specification 1 alleged he committed a sexual act against the victim by bodily harm; Specification 2 alleged he committed a sexual act against the victim while he knew or reasonably should have known she was asleep. After findings, the military judge merged both specifications into a single specification.[1]

Appellant asserts two assignments of error [AOEs]: (1) the Government was barred from trying Appellant after his first trial resulted in a mistrial; and (2) Specification 1 of the Charge fails to state an offense.[2] We find no prejudicial error and affirm.

---

[1] The Specification alleges Appellant did "commit a sexual act upon [LCpl Romeo—a pseudonym we have adopted for the victim], to wit: penetration of her vulva by the said Lance Corporal Cabrera's penis, by causing bodily harm to her, to wit: any offensive touching of the said [LCpl Romeo], however slight, including any non-consensual sexual act and non-consensual sexual contact; and penetration of the said [LCpl Romeo's] vulva by the said Lance Corporal Cabrera's penis, when he knew or should reasonably have known that she was asleep." Appellate Exhibit LXIV.

[2] This AOE is raised pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982). As originally drafted, Specification 1 alleged Appellant caused bodily harm by "any non-consensual sexual act *or* non-consensual sexual contact." The military judge amended the disjunctive "or" to a conjunctive "and" and also instructed the members on the judicially-created element of lack of consent by LCpl Romeo. We have considered this AOE and find it to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987), *cert. denied*, 485 U.S. 968 (1988).

## I. BACKGROUND

Appellant and Lance Corporal [LCpl] Romeo were close friends and first-term Marines assigned to the same unit in Camp Pendleton. They spent time together after work and on the weekends. They would eat together, watch movies together, and drink together, often in Appellant's barracks room. LCpl Romeo had slept in Appellant's barracks room once, leaving in the middle of the night. Theirs was a close, but platonic, relationship.

On 14 January 2017, LCpl Romeo and Appellant were in the barracks socializing. LCpl Romeo inadvertently locked herself out of her room. When Marines invited Appellant and LCpl Romeo to go out to clubs in downtown San Diego, LCpl Romeo was initially reluctant to go. Nevertheless, Appellant urged her to go, and said that he would not go unless she went, so she relented and went out with the group.

The group of Marines went to several bars and clubs. Appellant and LCpl Romeo drank heavily, as did others. LCpl Romeo experienced an alcohol induced blackout and was not able to recall many of the events of that night. Sometime in the early morning hours of 15 January 2017, the group returned to Camp Pendleton.

The last thing LCpl Romeo remembered from that night was smoking a cigarette outside of one bar discussing whether the group should go to another one. The next morning, she awoke in Appellant's bed with a pillow over her face. Her pants were down. Appellant was penetrating her vulva with his penis, withdrew, and then penetrated her anus with his penis. She panicked and froze, then fell asleep or lost consciousness. She next awoke in the light of morning. Her pants, which had been down, were up, and there was no longer a pillow over her face. Appellant was lying on the floor of the room, apparently asleep, with his arm over his face.

LCpl Romeo woke Appellant and demanded he tell her where her cell phone was; then she took her phone and drove back to her barracks, which were a short distance away. While sitting in her car, she called the base sexual assault hotline and requested assignment of a victim advocate.

By the time she found the barracks duty Marine to help her get into her room, she found Appellant waiting for her near her door. She ignored him. From the time LCpl Romeo left Appellant's room and throughout the next several days, she received several text messages and calls from him. Again, she ignored him. She went to the hospital later that day and submitted to a sexual assault forensic exam [SAFE]. Special agents of the Naval Criminal Investigative Service [NCIS] interviewed her a few days later when she elected to make her sexual assault report unrestricted.

During her NCIS interview, with her victims' legal counsel [VLC] present, the special agent asked LCpl Romeo to consider whether she would permit him to forensically search her cell phone to recover the text messages and call logs from the morning of the assault. The Special Agent warned LCpl Romeo that he could only conduct a full extraction of the cell phone; he could not simply extract the messages from Appellant or the messages from a particular time frame. Days later, LCpl Romeo informed the Special Agents she would not consent to a search of her cell phone. Inexplicably, the agents did not immediately seek LCpl Romeo's permission to take screenshots of the pertinent text messages from LCpl Romeo's phone, which would permit retention of crucial evidence without a full phone extraction. Nor did they ever discuss the content of the messages, even though they had repeatedly emphasized the importance of building a timeline of the events of 14-15 January 2017.

A few days after her interview, LCpl Romeo participated in a controlled call with Appellant. He denied that he had sex with her that night. When NCIS Special Agents interviewed Appellant the day after the controlled call, he persisted in denying any sexual contact with LCpl Romeo. He claimed she slept in his bed and he slept on the floor. He claimed that LCpl Romeo awoke early in the morning, said she was going to smoke, then left. Because she was still drunk, Appellant explained, he was worried about her. He called and texted her and tried to find her because he was concerned for her safety.

The Special Agents left the room to take a break. When they returned, they told Appellant that LCpl Romeo had a sexual assault examination. They also told him the kit had been analyzed and showed unknown male DNA. They asked him what he would say if the kit revealed this was his semen. Appellant stated he would be "shocked" and, if that were the case, he must have blacked out and not remembered the sex act.[3] Then he asked what consequences he might face and whether he could refuse to provide his DNA for comparison. When the Special Agents told him he could not refuse, he relented and said, "Yeah, I did it."[4] He admitted that he knew LCpl Romeo was asleep, but he pulled her pants down and penetrated her vagina anyway, stopping only when she moved in her sleep. Forensic analysis of the SAFE kit revealed that Appellant's DNA was, in fact, found on LCpl Romeo's genitalia and anus.

---

[3] Prosecution Exhibit [Pros. Ex.] 13 at 52; Pros. Ex. 12 at 09:57:43 AM.

[4] Pros. Ex. 13 at 53; Pros. Ex. 12 at 10:02:30 AM.

In an attempt to recover the text messages Appellant sent on the morning of the assault, the Government pursued a few courses of action. They requested and received a command authorization to seize and search Appellant's cell phone, but they could not conduct a forensic analysis. They sent a subpoena to Appellant's cellular service provider but could only obtain details of phone calls and could not obtain details or content of any text messages. The Government did not pursue these same investigative methods for LCpl Romeo's phone or cell phone records. They had offered her the opportunity to consent to search and when she refused, they did not ask whether she would consent to a less invasive review of her phone.

Not satisfied with this gap in the Government's evidence, the trial counsel Captain Westman later re-approached LCpl Romeo, again seeking the text messages. LCpl Romeo answered that she did not have the messages, and the trial counsel made no further inquiries. The trial counsel understood that LCpl Romeo "didn't have [the text messages] on her phone anymore for whatever reason," which the trial counsel *assumed* meant "she had a different phone or something."[5] Trial counsel merely accepted that LCpl Romeo was unable to provide the text messages "for some specific reason other than because she just wasn't willing to provide them."[6] But the trial counsel never determined what that "specific reason" might have been. She simply left the matter unresolved.

This unresolved matter reared its head during LCpl Romeo's testimony at trial, when the details surrounding her phone led to a Defense objection that revealed the trial counsel had failed to disclose statements she was constitutionally required to disclose. As the trial counsel apparently predicted, the civilian defense counsel cross-examined LCpl Romeo and established that she had refused to provide her cell phone to NCIS Special Agents for search. On re-direct examination, seeking to elicit a more palatable reason why LCpl Romeo refused the Special Agent's request, the trial counsel asked a leading question to which the military judge sustained a Defense objection. According to the trial counsel, she was intending to ask whether LCpl Romeo could not provide the messages because she had a different phone or because her

---

[5] Original Record [Orig. Rec.] at 668. This is a verbatim transcript of the first trial, which ended in a mistrial.

[6] *Id.* at 669.

"phone had deleted messages," though the trial counsel did not actually know the reason because she had never asked.[7]

In response, LCpl Romeo answered, to the stated surprise of the trial counsel, that her Apple iPhone automatically deleted text message conversations after a certain period of time, without user intervention. She said, "I had had a problem with the . . . phone . . . after a certain amount of time, it'll delete the text messages, it'll delete the phone records, I don't have any control over that; it's just something that my phone does automatically."[8]

Skeptical of this response, the civilian defense counsel requested an Article 39(a), UCMJ, hearing to challenge the trial counsel's conduct. He alleged the trial counsel's failure to disclose this statement by LCpl Romeo—assuming it had been made to the trial counsel pre-trial—constituted a violation of the Government's obligations pursuant to *Giglio v. United States*[9] to disclose impeachment information. The trial counsel said she had never heard LCpl Romeo make this claim before, as she had never demanded a clear answer why LCpl Romeo could not provide the messages. Although the trial counsel had asked a leading question, she said she was not trying to suggest a specific response because she did not know the answer.

In the course of trying to discern whether LCpl Romeo had previously made this seemingly incredible claim to the trial counsel, and whether trial counsel then failed to disclose it, the civilian defense counsel and military judge learned of several discovery violations. In addition, while litigating this discovery violation, the military judge came to believe that the trial counsel made deliberately evasive or inconsistent statements[10] to him about her conversations with LCpl Romeo leading up to trial. After accepting written filings and hearing oral argument over the course of two days, the military judge declared a mistrial. The propriety of the judge's action in declaring a mistrial—and whether the Defense consented to it—are key issues in this appeal.

After the mistrial, the convening authority ordered a second trial. The Defense moved to dismiss the charges on the basis of double jeopardy,

---

[7] *Id.* at 679.

[8] *Id.* at 661.

[9] 405 U.S. 150 (1972).

[10] *See* Orig. Rec. at 798-800.

arguing the Defense had not consented to a mistrial, which they argued was not manifestly necessary. The military judge denied this motion, and the members convicted Appellant of sexual assault.

Further facts necessary to resolve this AOE are included below.

## II. DISCUSSION

### A. The Military Judge's Ruling

The military judge issued a written ruling ordering a mistrial and outlining findings of fact and conclusions of law.[11] The military judge found that the trial counsel had committed four different discovery violations.

#### 1. Incomplete response relating to Government contact with LCpl Romeo

The Defense requested to interview LCpl Romeo before trial. She refused. In response, the Defense requested discovery from the Government indicating the date and general topic discussed during any meeting between the trial counsel and LCpl Romeo. The civilian defense counsel amplified his request with an email explaining why he requested the information and, perhaps sensing the trial counsel might lack experience, providing examples[12] of the types of statements that would be considered discoverable under *Giglio v. United States*. He emphasized his concern that, having no access to interview LCpl Romeo, it was doubly important that the Government disclose any of her inconsistent statements and new substantive statements. In the email response, the trial counsel provided only the dates of interviews, stated that LCpl Romeo now remembered going out to the bars about an hour later than she previously stated, and indicated that the Government had complied with and would continue to fully comply with its discovery obligations.

---

[11] Appellate Exhibit [App. Ex.] LXI at 635-53. This exhibit contains all appellate exhibits submitted during the first trial that resulted in a mistrial.

[12] "For example, LCpl [Romeo] reports to the [sexual assault forensic examiner] that she has no memory from the bar until she feels sex occurring while there is a pillow over her face. If she now remembers bits and pieces of that time that she previously did not remember, that should be disclosed." The civilian defense counsel delineated two other hypothetical examples then concluded "[t]hese are just three of many examples I can think of and are without regard to whether the inconsistency is understandable or directly beneficial to the Defense in your opinion. If her interviews with [trial counsel] reveal no information inconsistent with her prior statements, please confirm such." App. Ex. LXI at 593.

During trial, just before cross-examination, the civilian defense counsel asked the trial counsel, "[H]ave there been any additional interviews of LCpl [Romeo], or are there any additional disclosures since my email over the weekend?"[13] The trial counsel said, "No."[14] Later events revealed this was not correct—the trial counsel not only had a substantive discussion with LCpl Romeo, but LCpl Romeo provided an inconsistent statement the trial counsel failed to disclose. The trial counsel stated she did not disclose this additional interaction with LCpl Romeo because she thought the civilian defense counsel only sought disclosure of the times the trial counsel "met with [LCpl Romeo] to talk about testimony, substantive things, to go through her testimony."[15]

The military judge ruled that the trial counsel's terse response to the Defense written discovery request was "at a minimum, incomplete and at worst, misleading."[16] The military judge explained that the trial counsel should have fully complied with the request or, if she did not believe such information was subject to discovery, she should have so stated. Instead, she "provided incomplete information regarding both the . . . pretrial interaction with [LCpl Romeo] and *Giglio* information."[17]

The military judge found, considering those actions:

> when viewed in light of the arguments made in court, the court is left with the inescapable conclusion that [the trial counsel] was either unaware of the state of the evidence in the custody of the government, does not fully understand the discovery requirements of a prosecutor, was actively trying to play discover[y] games, or some combination of the above. Regardless of the reason, the information requested was *Giglio* material that should have been disclosed.[18]

---

[13] *Id.* at 628 (Affidavit of Civilian Defense Counsel).

[14] Trial counsel did state that LCpl Romeo had been present when trial counsel interviewed her mother over the weekend.

[15] Orig. Rec. at 808.

[16] App. Ex. LXI at 649.

[17] *Id.* at 649-50.

[18] *Id.* at 650.

*2. Failure to disclose LCpl Romeo's inconsistent statement*

Although the trial had come to a halt over the issue of LCpl Romeo's cell phone and text messages, it was a different statement that the military judge found to be the most egregious discovery violation. As detailed above, the civilian defense counsel requested a list of all of the dates the trial counsel met with LCpl Romeo. In between direct and cross-examination, the civilian defense counsel asked the trial counsel whether there had been any additional interviews since the discovery response. The trial counsel stated that LCpl Romeo was present when the trial counsel interviewed her mother but that she had not interviewed LCpl Romeo.

However, the trial counsel failed to disclose the fact that she also interviewed LCpl Romeo on the morning of trial. The trial counsel sought to clarify LCpl Romeo's recollection of two key points—her body positioning and the state of her clothes during the assault and after the assault when she first awoke. At trial, LCpl Romeo testified that when she awoke during the sexual assault she was on her back and that when she awoke after the assault, she was on her stomach. The detail about waking up on her stomach was new.

In its written motion, the Defense pointed out this new detail: "During the direct examination of LCpl [Romeo], Trial Counsel elicited the witness to testify that when she awoke 'on the second time' she awoke on her stomach. Trial Counsel had not previously disclosed this information which was not revealed in the NCIS interview to Defense."[19]

The Government responded, "[A]pproximately ten minutes before trial, LCpl [Romeo] stated to Trial Counsel for the first time that she woke up twice during the alleged assault, once on her back and once on her stomach."[20] The Government conceded that "[i]n her NCIS interview, LCpl [Romeo] had only described waking up on her back."[21]

During oral argument, the Government conceded it should have disclosed this statement pursuant to *Giglio v. United States*. The trial counsel explained that she believed at first that LCpl Romeo had made an inconsistent statement, but then she checked her notes (which were incorrect) and came to

---

[19] *Id.* at 562.

[20] *Id.* at 603.

[21] *Id.* at 612.

believe that this was not an inconsistent statement. She stated that her notes were incorrect because she recorded the special agent's question, not LCpl Romeo's response, but mistook this notation to represent LCpl Romeo's answer.

Consistent with the Government's concession, the military judge found this constituted a discovery violation.

### 3. *Mishandling non-privileged communications as privileged*

The weekend before trial, the trial counsel gave notice she intended to present evidence in presentencing that LCpl Romeo had experienced suicidal ideations. In response, the Defense requested any non-privileged materials relating to LCpl Romeo's mental state and any evidence of trauma. The trial counsel responded, "I can request non-privileged records related to [LCpl Romeo's mental health treatment] currently in possession of the Government and will provide whatever I find to the defense as soon as possible."[22] The trial counsel did not provide any responsive documents.

Then, during voir dire of the members, one member indicated that he knew LCpl Romeo because she was temporarily assigned to his unit. As the command sergeant major, he received email updates on LCpl Romeo's well-being, as reported by her chain of command, none of whom were mental health treatment providers. Although he knew she was seeing "counselors" in relation to a past suicidal ideation, the emails he described were command-generated updates based on leaders' interactions with LCpl Romeo.[23]

This member was excused from further service on the panel. Following this member's excusal, consistent with his earlier request, the civilian defense counsel asked the trial counsel to request the emails. The trial counsel contacted the excused member, who provided the emails. After her legal assistant received the emails, the trial counsel elected to treat the emails as though they were privileged. The trial counsel did not read them but instead forwarded them to LCpl Romeo's VLC.

The military judge only learned the Government had the emails after the civilian defense counsel brought up the issue on the record. The civilian defense counsel noted that he had asked the trial counsel to find and disclose the emails the excused member had discussed, and the trial counsel indicated

---

[22] *Id.* at 593.

[23] Orig. Rec. at 420.

that she would do so.[24] The trial counsel responded that "[w]e have since gotten emails from [the excused member], and the VLC is reviewing them because of what they might potentially contain."[25] She also stated she sent the emails to the VLC first because they "directly concern[ed] his client[]," and "because [the emails] had to deal with such a sensitive subject matter," so she thought it "would be something that he would be interested in seeing."[26] During questioning of the trial counsel, the military judge established that the trial counsel had entrusted the VLC to make the discovery determination on her behalf and to decide whether emails sent by LCpl Romeo's chain of command to other members of her chain of command were privileged.

The military judge ruled that the trial counsel "failed to exercise due diligence" in this matter.[27] The Defense had requested the information, it was subject to discovery under Rule for Courts-Martial [R.C.M.] 701 absent a claim of privilege, and the trial counsel stated she would provide it, but then she failed to do so and instead submitted it to the victim's legal counsel "because of a generalized concern regarding privilege."[28] The military judge held that, because the information was a routine chain of command update on LCpl Romeo's wellbeing, "it is highly unlikely that the contents of these routine emails would qualify . . . as privileged material under" Military Rule of Evidence 513.[29]

### 4. Failure to disclose note to VLC during LCpl Romeo's testimony

During the Defense cross-examination of LCpl Romeo, or immediately after, the trial counsel belatedly sought to ascertain the reason why LCpl Romeo could not provide the text messages from Appellant. She passed a note to LCpl Romeo's VLC, sitting in the gallery, asking, "She no longer has that phone, correct? When TC talked about texts, calls with her, she was willing to provide but didn't have."[30] The VLC responded, "I can't recall but either new

---

[24] *See id.* at 794.

[25] *Id.* at 837.

[26] *Id.* at 838.

[27] App. Ex. LXI at 650.

[28] *Id.*

[29] *Id.*

[30] *Id.* at 547, 559.

phone or messages were already deleted."[31] Based on this response, the trial counsel asked LCpl Romeo the leading question detailed above.

The military judge did not know of the existence of this note exchange until trial counsel cited it in defense of her contention that LCpl Romeo had never told her why she no longer had the text messages.[32] At that point, the military judge sua sponte challenged the propriety of the trial counsel consulting VLC during LCpl Romeo's testimony. As it pertained to discovery, he ruled that the note contained material discoverable under *Giglio v. United States* "because it bears directly on the impeachment of" LCpl Romeo.[33] The military judge interpreted the note as suggesting that the trial counsel already knew "of at least one possible innocuous explanation as to why the government [did] not have the text messages from the accused" other than the one that had been disclosed to the defense.[34] And the note contained "two additional explanations" made by LCpl Romeo's agent on her behalf, neither of which had been disclosed to the defense.[35]

In light of the trial counsel's earlier incomplete disclosures relating to her meetings with LCpl Romeo and the timing of the note, the military judge held the failure to disclose the note's contents constituted a discovery violation. The military judge found the note was "effectively an investigative step by the government to shore up a potential hole in their case—at the very time defense counsel [was] making it."[36] He added:

> While it is not hard to understand how a victim and her lawyer may be more inclined to cooperate with the government, that does not mean the government should be able to exploit that relationship during trial to ambush the defense with previously undisclosed factual assertions designed to rehabilitate the victim's credibility.

---

[31] *Id.* at 558.

[32] The civilian defense counsel and the military judge both questioned the credibility of the trial counsel's claim that she had no advance notice of LCpl Romeo's statement about why she no longer had the text messages.

[33] App. Ex. LXI at 648.

[34] *Id.*

[35] *Id.*

[36] *Id.*

*5. Conclusion that mistrial was justified*

Before granting the mistrial, on the record, the military judge stated that the undisclosed discovery could have changed the Defense strategy during motions practice and at trial. After properly citing the cases and rules pertinent to discovery, discovery violations, and mistrials, the military judge explained:

> The court does not understand how [the trial counsel] could think to notify defense counsel in her email response [the weekend before trial] about an hours' disparity in [LCpl Romeo's] recollection as to when they leave to go out drinking on the night in question, but did not think to inform defense counsel about [LCpl Romeo's] disclosure the morning before taking the stand that she now recalls waking up twice and once on her stomach.

> This is especially disturbing in light of a) how obviously well-rehearsed [LCpl Romeo's] direct testimony was and b) how [the trial counsel] was able to work that newly disclosed information into her direct examination.

> The cumulative nature and piecemeal manner in which the discovery violations by the government came to light in this case would undermine confidence in any verdict because any remedy short of mistrial would necessarily require the accused and the court to rely on the detailed trial counsel to understand and comply with their discovery obligations.[37]

He then weighed the feasibility and sufficiency of several possible remedies for discovery violations, as listed in Rule for Courts-Martial 701(g)(3). He rejected the Defense-requested remedy of dismissal with prejudice, which would "amount to a windfall for the accused."[38] He concluded that Appellant could "still receive a fair trial should the convening authority" decide to pursue one.[39]

He further rejected remedies less drastic than a mistrial as insufficient. He did not believe it would be sufficient to merely order the Government to

---

[37] *Id.* at 647.

[38] *Id.* at 651.

[39] *Id.*

permit proper discovery or to grant a continuance because "the violations [were] all at least in part a result of detailed trial counsel failing to fully understand or appreciate her discovery responsibilities."[40] He could not disallow presentation of the withheld evidence, as such evidence was impeachment evidence that would benefit the Defense; nor could he strike LCpl Romeo's entire testimony because the result would be the same as dismissal with prejudice. Recognizing that a mistrial is a "drastic remedy," he ruled such remedy was the "order [that was] just under the circumstances" under Rule for Courts-Martial 701(g)(3)(D).[41]

## B. Double Jeopardy after a Mistrial

After a mistrial is declared, under Rule for Courts-Martial 915(c)(2), further proceedings are permitted "except when the mistrial was declared after jeopardy attached and before findings, and the declaration was: (A) [a]n abuse of discretion and without the consent of the defense; or (B) [t]he direct result of intentional prosecutorial misconduct designed to necessitate a mistrial."[42] Neither party argues the Government acted deliberately to necessitate a mistrial. Both parties agree the mistrial was declared after jeopardy attached and before findings. Therefore, Appellant's second trial could proceed unless the mistrial was an abuse of discretion *and* was without the consent of the Defense.

### 1. Dismissal with prejudice was not appropriate

On appeal, Appellant argues the military judge "abused his discretion in declaring a mistrial *instead of dismissing the case with prejudice.*"[43] Arguing that his "first trial was polluted with discovery violations that materially

---

[40] *Id.*

[41] *Id.* at 652.

[42] This rule is consistent with the Supreme Court's holding in *United States v. Dinitz,* 424 U.S. 600 (1976), in which the Court recognized that an appellant "may nonetheless desire 'to go to the first jury and, perhaps, end the dispute then and there with an acquittal'" even though grounds exist to justify granting a mistrial. *Id.* at 608 (quoting *United States v. Jorn*, 400 U.S. 470, 484-85 (1971) (plurality opinion)).

[43] Appellant's Brief of 12 Jun 2019 at 21 (emphasis added).

altered the nature of the case," he then argues that "[d]ismissal would have been the *most appropriate* remedy in this case."[44]

Dismissal is a "drastic remedy" that is only "appropriate when an accused would be prejudiced or no useful purpose would be served by continuing the proceedings."[45] Dismissal is a remedy of last resort that is not appropriate if "an error can be rendered harmless" by other corrective action.[46] In *United States v. Stellato,* the Court of Appeals for the Armed Forces reversed the ruling of the service court of criminal appeals and reinstated the military judge's ruling dismissing charges with prejudice based on "continual and egregious" discovery violations.[47] The violations present in *Stellato* were of a far greater magnitude and severity than those present in this case.[48]

By the grant of a mistrial Appellant claims he was prejudiced in four ways in his second trial. We disagree with each of his contentions.

First, he argues he was prejudiced by revealing his strategy during the first trial. However, in his written ruling granting a mistrial, the military judge found that the civilian defense counsel had already revealed his strategy through pretrial communications and requests. The strategy—involving a motive to fabricate, drunken consent, and mistake of fact—would necessarily be revealed through pretrial motions, proposed voir dire, and in the Defense's request for instructions regardless of whether there had been one trial or two.[49]

---

[44] *Id.* at 21, 26 (emphasis added).

[45] *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004).

[46] *United States v. Stellato*, 74 M.J. 473, 488 (C.A.A.F. 2015) (quoting *Gore,* 60 M.J. at 187).

[47] *Id.* at 482.

[48] As an initial point of contrast, in *Stellato,* the "trial counsel . . . affirmatively and specifically declined to examine the contents of the box [of evidence] despite [an] . . . explicit offer for him to do so" and after he was told that the box contained notes, journals, and correspondence between a child victim and her mother containing the victim's statements describing the allegations against Major Stellato—including one note described as a recantation. To make matters worse, the trial counsel deliberately rejected the invitation to inspect the contents of the box in order to avoid having to disclose exculpatory evidence to the defense. *Id.* at 477-78, 486.

[49] *See* App. Ex. LXI at 526-34.

Second, he argues the members panel in the second trial was confused by references to the first trial. Our review of the record reveals no such confusion. During examination of LCpl Romeo, when necessary, the parties referred to a "previous hearing."[50] No member questioned the nature of this hearing.

Third, Appellant argues that because the new trial counsel "were in direct communication with the previous trial counsel," the "taint" of the original discovery violations was not mitigated.[51] However, this is no indication that any discovery violations occurred in the course of the second trial. The first trial counsel's communications with VLC, via email and text message, were disclosed and were the subject of additional litigation. Furthermore, the military judge ordered the new trial counsel to take "aggressive remedial actions" to ensure no further discovery violations occurred, including by reviewing the prior trial counsel's file.[52] The new trial counsel acknowledged this admonishment and, absent evidence suggesting otherwise, we presume he did so.

Fourth, Appellant argues that he was prejudiced by the mistrial because he elected to release his civilian defense counsel before the second trial because he could not afford to pay them. Appellant was expecting a child and decided he would prioritize saving for the baby. The military judge conducted an extensive colloquy with Appellant before permitting the civilian defense counsel to withdraw. He confirmed that Appellant knowingly and voluntarily desired to release his civilian counsel, he had not been pressured to do so, and he believed it was in his best interests. The military judge informed Appellant that the counsel would be ethically obligated to represent Appellant, even if he could not pay them, and the military judge would compel them to do so if Appellant desired.[53] Nevertheless, Appellant unequivocally stated that it was his own preference to release his civilian counsel. Although he stated he was satisfied to proceed to trial with his two detailed defense counsel, at the urging of the military judge, the senior defense counsel was additionally appointed to the case.

---

[50] Record at 301.

[51] Appellant's Brief at 28.

[52] Record at 95.

[53] The military judge noted that any debts owed could be the subject of later negotiation or settlement but that he would nonetheless order the civilian defense counsel to represent Appellant if he so desired.

We find that Appellant was not entitled to the drastic remedy of dismissal with prejudice, and his second trial was not prejudiced by the fact that his first trial ended in a mistrial. Therefore, we do not consider whether dismissal would have been a remedy *preferable* to Appellant. Rather, we consider whether there was manifest necessity to grant a mistrial and whether Appellant consented.

*2. The military judge did not abuse his discretion in finding the Defense consented to a mistrial*

The Defense made inconsistent statements about whether they consented to a mistrial. The Defense filed a written "Motion to Dismiss with Prejudice or Grant Other Appropriate Relief . . ." in which it asked for, in alternative to dismissal with prejudice, a mistrial.[54]

As oral argument progressed and it appeared likely that the military judge would grant a mistrial, the Defense focused their arguments on why dismissal with prejudice was the only adequate remedy. When directly asked to state the Defense position on a mistrial, the civilian defense counsel stated equivocally, "[W]e believe a mistrial not to be appropriate," but that it would be "more appropriate than continuing with this trial, with this trial team, or anyone associated with this trial team."[55]

When directly asked whether the Defense would object to a mistrial, the civilian defense counsel said, "I do," and noted that any "lack of objection has preconditions" requesting that the military judge impose "certain measures" to "attempt to remedy the prejudice that's created with the mistrial."[56] He also stated, "[I]f the Court can figure out a way that a mistrial eliminates and alleviates those issues, then we're in agreement" and that "we would object to a mistrial on just its face without protective measures."[57]

Instead of a mistrial, the civilian defense counsel requested to continue the trial, with the members then impaneled, but subject to conditions that included: a continuance; disqualifying the trial counsel and all others from her office; prohibiting newly assigned trial counsel from communicating with the trial counsel and learning the Defense strategy; setting a "new motion's

---

[54] App. Ex. LXI at 554.

[55] Orig. Rec. at 855.

[56] *Id.* at 857.

[57] *Id.* at 857-58.

[sic] date to relitigate certain motions"; permitting Defense to "do a new opening statement," and to "re-open cross-examination" of LCpl Romeo.[58] The military judge noted that this requested remedy was, in all but name and a new panel, a mistrial. We agree.

In his written ruling, the military judge stated the mistrial was granted "over the objection of the accused."[59] When the charges were re-referred and the parties litigated the Defense motion to dismiss charges on the grounds of Double Jeopardy, the military judge for the second trial concluded that the Defense's stated opposition was merely to gain tactical advantage and that the Defense had in fact consented to the mistrial.

Given the Defense's conflicting statements and their strident arguments that the Government's actions justified dismissal with prejudice, the second military judge's finding that the Defense consented to the mistrial does not constitute an abuse of discretion. However, even if the Defense had not consented to the mistrial, there was manifest necessity to grant a mistrial even over Defense objection.

### 3. There was manifest necessity to grant the mistrial

A mistrial is one of the possible remedies for a discovery violation.[60] "[M]istrials are disfavored."[61] A "military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings."[62]

A military judge has "considerable latitude" in determining whether to grant a mistrial.[63] It is a matter of "sound discretion," which we will not

---

[58] *Id.* at 867-68.

[59] App. Ex. LXI at 653.

[60] *See* R.C.M. 701(g)(3), which permits a military judge to "(A) Order the party to permit discovery; (B) Grant a continuance; (C) Prohibit the party from introducing evidence, calling a witness, or raising a defense not disclosed; and (D) Enter such other order as is just under the circumstances"—which could include granting a mistrial.

[61] *United States v. Commisso*, 76 M.J. 315, 318 (C.A.A.F. 2017) (citing *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F. 2003)).

[62] R.C.M. 915(a).

[63] *United States v. Seward,* 49 M.J. 369, 371 (C.A.A.F. 1998).

disturb in the absence of a clear abuse of that discretion.[64] A military judge abuses his discretion "when [the military judge's] findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law."[65]

The Defense arguments in support of dismissal—articulated at trial and on appeal—all establish the manifest necessity of a mistrial in this case. The military judge encapsulated the evidence presented in his findings of fact. Those findings are supported by the record, are not clearly erroneous, and Appellant does not dispute them. The military judge recited the applicable principles of law, and his decision was reasonable. In addition to the reasons cited in his ruling, he also articulated the importance of the withheld discovery to the Defense case.

The Defense articulated the importance of LCpl Romeo's statement that she woke up on her stomach.[66] Based on all prior statements of which the Defense was aware, LCpl Romeo described how she had woken up, (only) on her back, with a pillow on her face. The Defense anticipated that the Government would argue Appellant put a pillow over the victim's face so that she could not identify her assailant. The Defense viewed the pillow as a "real bad fact"[67] that severely undercut Appellant's defense, which was that two friends engaged in a regrettable experience of drunken sex that neither remembered but during which Appellant reasonably believed LCpl Romeo consented. Then, Appellant falsely confessed, which the Defense argued was supported by the fact that he had gotten the facts wrong and only confessed to the

---

[64] *United States v. Rosser*, 6 M.J. 267, 270, (C.M.A. 1979)

[65] *Stellato*, 74 at 480 (alteration in original) (quoting *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008)).

[66] The Government's written motion inconsistently described two versions: 1) that LCpl Romeo woke up once on her back while she was being assaulted and then again on her stomach when Appellant was sleeping; and 2) that LCpl Romeo stated she awoke twice while she was being assaulted, once on her back and the second time on her stomach. *See* App. Ex. LXI at 602, 612. Both renditions were inconsistent with LCpl Romeo's NCIS interview; the second rendition was inconsistent with her testimony at the first trial. The trial counsel stated that LCpl Romeo told her the first version, not the second, and that her written filing was "absolutely poorly worded." Orig. Rec. at 806.

[67]*Id.* at 774.

version of events LCpl Romeo relayed to him in the pretext phone call. The Defense argued that knowing LCpl Romeo awoke on her stomach, face down, would allow them to argue Appellant never put a pillow over her face. Rather, they could argue that her face was on the pillow because she had been sleeping on her stomach and she was "confusing a pillow [on her face] for being on her stomach."[68] The civilian defense counsel then described how he curtailed potential aspects of the Defense strategy because of this "bad fact," and he could present a different strategy altogether after having learned of this disclosure.

Based on this impact on the Defense strategy and the reasons cited by the military judge, we find that it was manifestly necessary to grant a mistrial. In this case, granting a mistrial was "within the range of remedies available to the military judge," and the military judge did not abuse his discretion in granting a mistrial.[69] Had the first trial proceeded to findings, the Government's discovery violations would have "cast substantial doubt upon the fairness of the proceedings."[70]

Because there was manifestly necessary for the military judge to grant a mistrial, the Government was permitted to re-refer the charges and try Appellant at a second court-martial, even if the mistrial had been granted over his objection.

We believe it is worth reiterating the words of our superior court from *United States v. Stellato,* describing the Government's discovery obligations as follows:

> Discovery in the military justice system, which is broader than in federal civilian criminal proceedings, "is designed to *eliminate pretrial gamesmanship*, reduce the amount of pretrial motions practice, and reduce the potential for surprise and delay at trial." This Court has held that trial counsel's "obligation under Article 46," UCMJ, includes *removing "obstacles to defense access to information"* and providing "such other assis-

---

[68] *Id.* at 763.

[69] *Id.* at 491.

[70] R.C.M. 915(a).

tance as may be needed to ensure that the defense has an equal opportunity to obtain evidence.[71]

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. Arts. 59, 66, UCMJ.

The findings and sentence are **AFFIRMED**.

Judges LAWRENCE and STEPHENS concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[71] *Stellato*, 74 M.J. at 481 (C.A.A.F. 2015) (emphasis added) (citations omitted) (quoting *United States v. Jackson*, 59 M.J. 330, 333 (C.A.A.F. 2004); *United States v. Williams*, 50 M.J. 436, 442 (C.A.A.F. 1999)).